*In re* CUSTODY OF PERI BAROKAS, a Minor.—(Stephen R. Feuer *et al.*, Petitioners-Appellees *v.* Mary Jane Barokas, Respondent-Appellant.)

First District (1st Division)   No. 81—1684

Opinion filed September 27, 1982.

Victor Brown and William F. Krahl, both of Chicago, for appellant.

Stanley F. Kaplan and Claire Adair, both of Chicago, for appellees.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Respondent, Mary Jane Barokas, appeals from a decision of the circuit court of Cook County awarding custody of respondent's 15-year-old daughter, Peri Barokas, to nonparents, petitioners Stephen

R. Feuer and Linda M. Feuer, under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 101 *et seq.*) (hereinafter IMDMA). The issues raised on appeal are: (1) whether petitioners had standing to commence the action; and (2) whether section 610 of the IMDMA establishes the appropriate standard for change of custody to a nonparent.

On June 4, 1980, petitioners filed an emergency petition for custody of Peri alleging that the child then resided with them, that she was neglected and threatened with mistreatment by the mother, and that she wished to live with petitioners. Petitioners also sought to enjoin the mother from removing the child or trying to telephone or visit her. Petitioners met Peri 15 months before the filing of the petition at a time when Stephen Feuer, an attorney, was representing Peri's mother. The court issued a temporary restraining order *ex parte.* On July 1, 1980, respondent filed a special appearance and moved to dismiss the cause for lack of jurisdiction, arguing that section 601(b)(2) of the IMDMA provided for commencement of a child custody proceeding by a nonparent only if the child "is not in the physical custody of one of [her] parents." (Ill. Rev. Stat. 1979, ch. 40, par. 601(b)(2).) Respondent alleged that she had legal custody of the child pursuant to a divorce decree entered in 1974 and that she had not given physical custody to the Feuers. Respondent alleged that petitioners took possession of the child from the home of the child's adult sister, without respondent's permission, on the evening of June 3, 1980, and filed the emergency petition for custody the following morning. The court found that it had jurisdiction of the subject matter based upon the affidavits, motions and arguments of counsel and denied respondent's motion to dismiss on July 17, 1980. The matter was set for trial on the remaining issues.

The trial was held on December 11, 1980, and March 30, 1981, at which time respondent reiterated her contention that the petitioners lacked standing. The trial court, however, held that the standing issue was *res judicata* based on the July 17 order. The first witness for petitioners was a social worker who had been appointed by the court to conduct a custody investigation. The social worker testified that Peri had blossomed during the period she had spent with the Feuers and that in her opinion Peri's best interests would be served by awarding her custody to the Feuers. She testified that in her interview of Peri, Peri had complained of having to often go to fast food restaurants to get food for herself and of going hungry when she did not want to go out to buy a meal. Peri also complained of sleeping on the floor of her mother's bedroom and of their frequent moves from one apartment to

another. The social worker described respondent's apartment as cluttered with moving boxes and not clean.

Peri's eight-grade teacher for the 1978-1979 school year testified that she considered Peri to be a troubled child who was "looking for love anyway she could find it." The teacher testified Peri often arrived at school looking pale and tired and would ask if she could sleep at school since she was unable to sleep at home. Peri's school work was below average. The teacher scheduled a conference with Mrs. Barokas at which she suggested that respondent arrange counseling for Peri since it was the teacher's belief that a great deal of Peri's energy went into worrying about her own problems. The teacher suspected that there were frequent verbal arguments between the mother and the daughter. An incident at school prompted the teacher to schedule another parent-teacher conference. One day Peri left the classroom suddenly and the teacher found her in an empty classroom crying and shaking. Peri told the teacher that she was having problems at home which she was not allowed to talk about and that she thought that she might be having a nervous breakdown. The teacher suggested immediate counseling for Peri, which was not arranged until sometime later.

Respondent testified that she was 45 years old and was currently employed part-time as a research assistant to a historian and was a part owner of an artist's co-operative at which she sold her work. Respondent's testimony disclosed that she had two daughters, Kimberly, age 25, and Debra, age 22, by her first marriage. Kimberly had lived on her own since she was 18. Debra had lived with Peri and respondent until she was 16 years old, when difficulties between Debra and her mother led her mother to place Debra with friends. Peri's father resides in Turkey, and has had no contact with his child in 12 years.

Respondent testified that she was hospitalized for 4½ months following a suicide attempt in January 1977. In a juvenile court action, Peri was placed with a private party while her mother was recovering. In May 1977, respondent regained custody of Peri. Respondent testified that between May 1977 and the commencement of this action, she and Peri had seven residences. Sometimes they lived in their own apartment; other times they shared apartments with various women friends of the respondent, and once, they lived with a family for whom her mother worked as a housekeeper. The moves were triggered by either disputes with the landlord, disagreements with the roommates or financial difficulties resulting from the cessation of child-support payments from Peri's father.

Respondent testified that Peri met petitioners in March 1979,

when Stephen Feuer represented respondent in a dispute between her and a roommate. Respondent stated that with her permission Peri began to work in petitioner's law office after school. Respondent testified that in May 1980 Peri was operated on to remove a cyst from her ovary. At that time Peri had dropped out of high school at the suggestion of her therapist since she was very depressed and unhappy at school, was doing poorly, and frequently cut classes. Respondent testified that the weeks before that surgery were very trying for Peri because she was afraid of the surgery and ashamed to be seen by her former classmates now that she was not attending school. So it was agreed that her mother would let her visit the Feuers for approximately eight nonconsecutive days. Peri was released from the hospital on May 28, 1980, and respondent took Peri to stay with Peri's sister Kimberly, until respondent found a new apartment as a prior lease arrangement had been broken by the lessor.

Peri testified in chambers that she would not return to her mother even if the court so ordered. She testified that ever since 1977 she and her mother had argued constantly about everything. Peri testified that on one occasion her mother had hit her on the knee with a pan. Peri stated that in order to prevent her from leaving the apartment late at night, her mother would tie Peri's bedroom door shut or threaten to spray Peri with mace. Her mother would also threaten to disfigure Peri by pouring hot coffee over her while she slept. Peri testified that once she slept with a knife under her pillow for three days as a result of these threats but admitted that she may have become paranoid. Peri indicated that she and her sister had talked about ways for Peri to get away from her mother. The Feuers did not tell Peri that they would let her stay with them until after Peri's operation when she was staying with Kimberly. Peri also told the court that she did not want to live with her mother because her mother was planning to move to the south shore, an area which Peri considered to be too dangerous. Peri said that her mother wanted to move there "to isolate me from everything." Peri testified that she liked her new school, was getting high grades and had new friends. She stated that she would prefer to live with the Feuers.

Petitioner, Stephen Feuer, testified that he first met Peri in March 1979. His secretary became ill so he decided to hire a high school student temporarily to answer the telephone and do filing. Since Peri was the child of a client and seemed bright, he hired her. Feuer testified that he and his wife often took Peri out to dinner after they finished work. Feuer testified that on four or five occasions he took Peri to the beach. Different people would accompany them:

Peri's sister, Kimberly, Mrs. Barokas and his wife. The Feuer's also took Peri on a weekend vacation to Indiana. Feuer testified that "most of the time" he and his wife would ask Mrs. Barokas for permission to take Peri somewhere, but "after we had known Peri for a while, we told Peri we would like to take her to a show or whatever we had in mind and expected her to ask her mother."

Feuer testified that he had long conversations with Mrs. Barokas on two occasions about the problems she was having with her daughter. After the second of these, Feuer suggested that Peri stay with the Feuers during the summer so that Mrs. Barokas could take a vacation and she and Peri could work out their problems before the school year began.

Feuer testified that he and his wife decided to seek custody of Peri about the time that she was in the hospital. He stated that her situation seemed desperate and he thought that seeking her custody was preferable to allowing Peri to carry out her threats to run away from home.

Kimberly Barokas testified that for sometime she had been alarmed because the arguments between her mother and Peri were becoming frequent and more violent and Peri had talked more seriously about suicide. The sister testified that she repeatedly urged her mother to seek counseling for herself and Peri but no arrangements were made until Kimberly made the appointments and accompanied her mother and sister to the first two sessions. Kimberly testified that Peri was still undergoing therapy. Kimberly also testified that sometimes her mother was a very concerned type of parent and other times she was not.

Respondent contends that petitioners did not have standing to commence this suit. Respondent argues that under section 601(b)(2) of the IMDMA a nonparent may commence an action to acquire custody of a child only if the child "is not in the physical custody of one of his parents." (Ill. Rev. Stat. 1979, ch. 40, par. 601(b)(2).) Respondent argues that the trial court erred in finding that the taking of the child from the home of her adult sister, without her mother's permission, one day before filing the custody action, gave petitioners physical custody within the meaning of the statute. Respondent asserts that such an interpretation is contrary to the spirit and intent of the IMDMA and would lead to the illogical position that a nonparent may file for custody any time a child is not in the physical presence of one of his or her parents.

Respondent argues that she had physical custody of the child at the time petitioners brought this action. She obtained custody in 1974

pursuant to a divorce decree and except for five months in 1977 she continued to have possession and control of the child until the court issued a temporary restraining order prohibiting her from contacting her daughter. Respondent maintains that she never relinquished the child's custody to petitioners nor has she acquiesced to their attempt to obtain custody. She also argues that her adult daughter had no authority to release Peri into the possession of petitioners. Although there was a special hearing on the jurisdictional issue, no evidence was taken. Respondent argues that there should have been a bifurcated hearing with evidence taken on the issue of standing.

Petitioners argue that the issue of who has physical custody is a factual question to be decided by the trial court, and its definition will differ from case to case. Petitioners assert that they have an absolute right pursuant to the IMDMA to bring this action since they had actual, physical possession of the child. Petitioners argue that the alleged behavior of the mother, and the child's desire to reside with them, give further evidence of their right to bring this action. Petitioners also argue that respondent relinquished her right to physical custody by turning to petitioners for help in caring for her child, by relying on petitioners to provide a home for Peri during the traumatic period before her operation and by placing Peri with her sister while she was recuperating from the operation.

Section 601(b) of the IMDMA determines who, other than a parent, has standing to bring a child custody action. It provides in part:

"(b) A child custody proceeding is commenced in the court:

(1) by a parent, by filing a petition:

* * *

(2) by a person other than parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents."

The Uniform Child Custody Jurisdiction Act (Ill. Rev. Stat. 1979, ch. 40, par. 2101 *et seq.*), which is incorporated by reference into section 601(a), defines physical custody as "actual possession and control of a child" (Ill. Rev. Stat. 1979, ch. 40, par. 2103.08). Section 601(b) places no qualifications on a parent's standing to file a petition for the determination of child custody or for the modification of a prior determination. A nonparent, however, is restricted as to when he or she has standing to invoke the court's jurisdiction over child custody. Section 601(b)(2) is substantially identical to section 401(d)(2) of the Uniform Marriage and Divorce Act (hereinafter Uniform Act). The Commissioner's Note to the Uniform Act clarifies the meaning of this

section within the statutory scheme:

"*** if one of the parents has physical custody of the child, a non-parent may not bring an action to contest that parent's right to continuing custody under the 'best interest of the child' standard of Section 402. If a non-parent (a grandparent or an aunt or uncle, perhaps) wants to acquire custody, he must commence proceedings under the far more stringent standards for intervention provided in the typical Juvenile Court Act. In short, this subsection has been devised to protect the 'parental rights' of custodial parents and to insure that intrusions upon those rights will occur only when the care the parent is providing the child falls short of the minimum standard imposed by the community at large—the standard incorporated in the neglect or delinquency definitions of the state's Juvenile Court Act." (Commissioners' Note, Uniform Marriage and Divorce Act sec. 401, 9A Uniform Laws Annotated 194-95 (1979).)

This important distinction in the standing requirements for parents and nonparents protects the single parent from challenges to his or her right to custody by interested third parties so long as the child is in the parent's physical custody.

In *Henderson v. Henderson* (1977), 174 Mont. 1, 568, P.2d 177, the Montana Supreme Court interpreted a standing provision similar to the section at issue here. A father who had obtained custody of his two children following a divorce decree died suddenly in a car accident. An aunt of the children took them from the care of a babysitter and subsequently filed for custody. The court held that the aunt did not have standing to commence a custody action. The court determined that physical custody in section 401(d)(2) of the Uniform Act "is not limited to having actual, immediate control of the physical presence of the child." (174 Mont. 1, 5, 568 P.2d 177, 179.) The court found that the standing requirement referred to "the custodial rights involved in the care and control of the child" (174 Mont. 1, 5, 568 P.2d 177, 179), and refused to accept an interpretation of this section which would "allow a nonparent to file a petition for custody anytime the child is out of the physical presence of the parent or parents, even if for a few minutes" (174 Mont. 1, 5, 568 P.2d 177, 179).

Petitioners argue that this court should not follow *Henderson* since *Henderson* dealt with a Montana law which automatically transferred custody from one parent to the other upon the death of the custodial parent. We do not view this distinction as significant since both *Henderson* and the case at bar require a determination in the first instance of whether a nonparent has standing to file a custody

petition against the right of a parent who has been awarded custody either by the court as in the case at bar or by operation of law as in *Henderson.*

The Arizona Court of Appeals adopted the interpretation of section 401(d)(2) of the Uniform Act given in *Henderson. (Webb v. Charles* (1980), 125 Ariz. 558, 611 P.2d 562.) In *Webb,* a father brought a *habeas corpus* action to obtain custody of his son who was residing with the child's grandmother following his wife's death. The grandmother responded by alleging that the father was unfit to obtain custody. The court found that the grandmother did not have standing under Arizona's version of section 401(d)(2) of the Uniform Act to raise the issue of fitness to obtain custody since the father never relinquished the right to care and control of his child. The court noted that if the grandmother believed that the father was not a fit parent, she should use the statutory remedies of the juvenile court. In denying its jurisdiction over the custody issue, the court noted that "when the state deprives a parent of the fundamental right to raise his child, the proceedings must be conducted in a strict compliance with the statutes involved." 125 Ariz. 558, 561, 611 P.2d 562, 565.

Petitioners rely on *Webb* to argue that respondent relinquished her right to the physical custody of Peri by her inability to provide Peri with a stable environment, by allowing Peri to visit petitioners for eight days, and by placing Peri with her sister. These actions, petitioners argue, are tantamount to actually relinquishing physical custody. We believe this argument to be without merit. The *Webb* court refused to hold that the father had relinquished the custody of his son by allowing him to stay with his grandmother at the time of his wife's funeral. Certainly respondent is entitled to seek the assistance of others in the raising of her daughter without affecting her custodial rights. We find no basis in the statute or in the *Webb* case for petitioners' theory of constructive relinquishment of physical custody.

"The right and correlative responsibility of a parent to care for his or her child is fundamental and as ancient as mankind." (*In re Custody of Townsend* (1981), 86 Ill. 2d 502, 509, 427 N.E.2d 1231, 1235.) In a custody dispute between a parent and a nonparent, the parties do not start out on equal footing, unlike a custody dispute between parents. (*Townsend.*) This inequality between the positions of parents and nonparents is incorporated in the standing requirements of section 601.

In the recent case of *Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388, the United States Supreme Court held that the due process guarantees of the fourteenth amendment

protect natural parents in a State initiated proceeding to terminate parental rights. The court stated:

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." (455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1394.)

We note that the consequences to a parent's interests of a change of custody from a parent to a nonparent under IMDMA are severe. Unlike an action under the juvenile court, a "court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served." (*In re Custody of Townsend* (1981), 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234.) Moreover, section 610 of the IMDMA prohibits a parent from petitioning to regain custody for two years unless the child's physical or emotional health is seriously endangered. A nonparent who obtains custody pursuant to IMDMA is not under a legal obligation to mend the relationship between the child and his or her parents.

We are not convinced under the circumstances of this case that the manner in which petitioners acquired the child satisfied the standing requirement of section 601(b)(2). Overnight contact with third parties fails to fulfill the statutory provision that the child not be in the physical custody of one of her parents. A parent's "actual possession and control of a child" (Ill. Rev. Stat. 1979, ch. 40, par. 2103.08) is not lost every time the child visits or spends a vacation with a relative or friend. We do not accept petitioners' theory that physical custody may be relinquished by default if a parent performs the task of parenting in a less than adequate manner. Petitioners cannot deprive respondent of physical custody of her child so as to acquire standing under section 601(b)(2) by taking the child from the home of her adult sister where respondent had placed her.

Respondent filed a special appearance and a motion to dismiss under oath contesting petitioners' standing. The motion and the affidavit accompanying it appear to refute petitioners claim that they came into possession of the child by any lawful act. Therefore, respondent was entitled to a hearing and an opportunity to present evidence on the jurisdiction and standing issue before proceeding to a consideration of the merits of the custody petition.

■ We recognize that petitioners are motivated by a laudable concern for the child's welfare. We also recognize that the effects of this decision will be minimal in view of the age of the child who will turn 18 in April 1983. Nevertheless, a natural parent's superior right to the care, custody and control of his child (*Townsend*) should not be deprived absent strict compliance with the statutory provisions involved. Therefore, we vacate the judgment order and the order entered July 17, 1980, which denied respondent's motion to dismiss, and remand for a hearing on the issue of jurisdiction and standing as to the date of the filing of the petition. In view of the disposition of this case, we find it unnecessary to discuss the remaining issue.

For the reasons stated herein, we reverse and remand for further proceedings consistent with this opinion.

Judgment reversed and remanded.

McGLOON and O'CONNOR, JJ., concur.