KAREN FRANKLIN, Plaintiff-Appellee, v. RICHARD DeVRIENDT, Defendant-Appellee (Sandra Furman *et al.*, Intervenors-Appellants).

First District (2nd Division)   No. 1—95—4007

Opinion filed May 13, 1997.

Mark L. Kezy, of Chicago, for appellants.

Joan. S. Colen, of Chicago, and G. Eric Sproull, law student, for appellees.

JUSTICE TULLY delivered the opinion of the court:

Intervenors Sandra and Richard Furman appeal from an order of the circuit court denying them leave to intervene and file a petition for legal guardianship of their granddaughter, Roxanne DeVriendt.

Roxanne DeVriendt was born on September 15, 1992. Her natural parents, plaintiff Karen Franklin and defendant Richard DeVriendt, were not married to each other and did not reside together. On or about November 13, 1992, upon agreement between plaintiff and Sandra Furman, Roxanne went to live with intervenors, Roxanne's paternal grandmother and step-grandfather. On August 3, 1993, the trial court entered an order, pursuant to a joint petition filed by plaintiff and defendant, establishing defendant's paternity and awarding joint custody of Roxanne to plaintiff and defendant. In July 1994, intervenors filed a petition for legal guardianship of Roxanne. Rather than pursuing this petition, however, intervenors

subsequently filed a motion to vacate the August 3 order and sought to intervene and petition the court for custody of Roxanne. Plaintiff then filed a petition for modification of custody seeking an award of sole custody of Roxanne. During the proceedings, the court ordered that Roxanne was to remain with the intervenors and granted plaintiff weekly visitation. The trial court appointed a guardian *ad litem* and attorney for Roxanne. At the conclusion of a hearing on the issue of whether intervenors had standing to intervene and seek custody of Roxanne pursuant to section 601(c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601(c) (West 1994)), the trial court concluded that the intervenors did not have physical custody of Roxanne and therefore lacked standing.

At the hearing, the parties entered by stipulation the deposition testimony of plaintiff and Sandra Furman. The court also heard testimony. The evidence established that Sandra Furman (Furman) first became aware that plaintiff and defendant had a child together approximately six days after Roxanne was born. Thereafter, Furman began visiting Roxanne at plaintiff's apartment every two to three days. At the time, plaintiff was living in a two-bedroom apartment with her five other children, three grandchildren and a niece. Furman testified that when she visited, she brought food, clothing and other necessities for Roxanne because plaintiff did not have these items.

On November 13, 1992, Furman went to plaintiff's apartment at defendant's urging because there had been no electricity in the apartment for several days. When Furman and defendant arrived, there was no electricity, and plaintiff was attempting to heat the apartment by lighting the stove burners. Furman offered to care for Roxanne until plaintiff was able to rent a new apartment. Plaintiff agreed and sent Roxanne and all of her belongings with Furman.

From November 1992 until about May 1994, defendant babysat for Roxanne during the days, while intervenors were at work. Defendant did not reside with intervenors. After May 1994, Furman quit her full-time job and began working part-time in the evenings and on weekends. Furman then cared for Roxanne during the day, and her husband or daughter cared for Roxanne while she worked. After defendant stopped babysitting daily, he continued to visit Roxanne, approximately twice per week. Defendant paid intervenors $60 to $100 per month until October 1994. He also told intervenors that he would take Roxanne when he was working and had an apartment.

Furman testified that plaintiff visited Roxanne once every two or three weeks, for two to three hours per visit, until Roxanne was five or six months old. Then plaintiff's visits to Roxanne decreased to

about once a month, primarily on holidays. During the summer of 1993, plaintiff began skipping months without a visit. Plaintiff had an overnight visit with Roxanne in April 1993. Furman testified that the decrease in plaintiff's visits came after Roxanne was diagnosed with a birth defect in her left optic nerve, which required that the child wear an eye patch eight hours per day. Plaintiff never asked Furman to return Roxanne to her. Plaintiff once offered to buy diapers, but Furman told her to keep the money to get an apartment and furniture.

When Roxanne was six months old, she was diagnosed with a birth defect to her left optic nerve. Plaintiff accompanied Furman to the doctor when Roxanne received her inoculations, but she did not attend any doctor appointments related to the eye condition. Roxanne was insured under plaintiff's insurance policy until July 1994, when the Furmans transferred Roxanne to Richard Furman's insurance policy because plaintiff was in danger of losing her job.

Furman testified that she was not aware of the joint custody order entered on August 3, 1993, until intervenors filed their petition for legal guardianship of Roxanne. At that time, defendant informed her of the custody order. Furman testified that she and her husband petitioned for legal guardianship of Roxanne because they had been caring for Roxanne for two years and contemplated caring for her until the age of 18. Furman wanted legal guardianship so that she would be able to take Roxanne to the doctor and sign for medical procedures. Furman testified that Roxanne calls intervenors "grandma" and "grandpa," but later testified that Roxanne has attempted to call her "mommy."

Plaintiff testified that she allowed Furman to take Roxanne because she was having problems at work, arriving late or not at all when she had babysitting difficulties. She was also having difficulty with defendant, who was threatening that if Roxanne was hurt, he would harm plaintiff's other children. Plaintiff indicated that her agreement with the intervenors was that she and defendant would try to find an apartment together and that, when they did, she would come and get Roxanne.

Plaintiff testified that between November 1992 and August 1993, when she and defendant filed a petition to establish paternity, she visited Roxanne "on [her] off days and on weekends and sometimes not on [her] off days." Between August 1993 and July 1994, she visited as often as she could and tried "to get out there at least once a week." Plaintiff gave money to defendant for Roxanne's care, but on the several occasions she attempted to give Furman money, Furman would not accept it.

Plaintiff testified that she moved into a new apartment in August 1993. She asked defendant for Roxanne, but defendant refused and threatened her. Plaintiff and Furman both testified regarding an incident that occurred when Roxanne was about six months old. Defendant and Furman had taken Roxanne to visit plaintiff. Plaintiff demanded that defendant leave Roxanne with her. Defendant refused, put Roxanne in the car and instructed Furman to drive away. Furman testified that on that occasion defendant informed her that plaintiff was drunk, and plaintiff was screaming and pounding on the car. Subsequent to these incidents, plaintiff had overnight visitations with Roxanne and always returned Roxanne to the Furmans. On cross-examination, plaintiff stated that she never asked Sandra or Richard Furman to return Roxanne to her.

The trial court found that intervenors had physical possession rather than physical custody of Roxanne and that Roxanne had remained in the physical and legal custody of both her parents at all times. The trial court specifically found that it was defendant who initiated intervenors' involvement in caring for the child and that defendant played a major role in the child's life, which included providing regular child care and monetary support. The court found that plaintiff had an agreement with defendant rather than intervenors and intervenors were acting upon the direction of defendant. Therefore, the court determined it was appropriate for plaintiff to direct her requests for Roxanne's return to defendant.

█ Section 601 of the Illinois Marriage and Dissolution of Marriage Act allows a nonparent to file a petition for custody of a child only if the child "is not in the physical custody of one of his parents." 750 ILCS 5/601(b)(2) (West 1994). For purposes of determining who has physical custody of the child, courts do not look solely at who has physical possession of the child at time of filing. *In re Custody of Peterson*, 112 Ill. 2d 48, 54 (1986). Instead, the courts also consider how that possession came about and the nature and duration of the possession. *In re Marriage of Carey*, 188 Ill. App. 3d 1040, 1048 (1989). The courts have also looked to who is providing for the child's care, custody and welfare. *In re Marriage of Kulawiak*, 256 Ill. App. 3d 956, 962 (1993). In order for a nonparent to have physical custody of the child, the parents must have "voluntarily and indefinitely relinquished custody of the child." *In re Petition of Kirchner*, 164 Ill. 2d 468, 491 (1995). The party seeking to intervene bears the burden of establishing standing. *In re Marriage of Sechrest*, 202 Ill. App. 3d 865, 870 (1990). Once standing has been established, the court will apply the best interests of the child standard in resolving the custody dispute. 750 ILCS 5/602 (West 1994). A reviewing court will disturb

an order entered by the trial court in a custody proceeding only if the order is against the manifest weight of the evidence or will result in a manifest injustice. *In re Custody of McCuan*, 176 Ill. App. 3d 421, 427 (1988).

In summary, a nonparent seeking standing under section 601(b) must establish that the child is in the physical custody of a nonparent, which necessarily requires that both of the child's parents must have voluntarily relinquished custody of the child. That is not so in the instant case.

Intervenors rely on *In re Custody of Menconi*, 117 Ill. App. 3d 394 (1983), where the child's father asked his parents to care for his infant son, whose mother had died. The grandparents cared for the child for six years, except for short intervals during which they returned the child at the father's request. After the child's father forcibly removed her from the grandparents' home, they filed a petition for custody. *Menconi*, 117 Ill. App. 3d at 395. The court found that the father had voluntarily relinquished custody of his daughter, noting the voluntary nature of the initial transfer, the length of time the grandparents cared for the child, the child's integration into the grandparents' home and the father's sporadic contact with the child. *Menconi*, 117 Ill. App. 3d at 398.

■ In this case, plaintiff did allow intervenors to care for Roxanne. However, there was ample evidence that the parties intended this to be a temporary situation in order to allow plaintiff to obtain a more suitable apartment for raising the child. In addition, both parents maintained contact with the child during this time. Defendant cared for the child on a daily basis from November 1992 to May 1994 and provided financial support as well. While the frequency of plaintiff's visits is disputed, she clearly did visit the child. Both Furman and plaintiff testified that Roxanne was aware that plaintiff was her mother. Plaintiff also gave defendant money and items for the child's care. Furman refused to accept money from plaintiff. Furthermore, when plaintiff did move into a new apartment, approximately eight months after Roxanne went to live with intervenors, defendant refused plaintiff's request to return Roxanne. Based on defendant's daily contact with Roxanne and relationship with intervenors, plaintiff was justified in directing her requests for Roxanne's return to defendant.

In *In re Marriage of Dile*, 248 Ill. App. 3d 683 (1993), the child's mother had been awarded custody in divorce proceedings. The father maintained contact with his daughter even after moving out of state. After the child's mother committed suicide, the child's maternal grandparents took her to their home and refused to relinquish her to

her father. The father agreed to allow his daughter to remain with the grandparents at that time because of the trauma she had suffered, but he continued to assert that he wanted custody of her. Seven months later, the grandparents filed a petition for custody. *Dile*, 248 Ill. App. 3d at 683-84. The court held that the grandparents did not have physical custody of the child as required to establish standing under section 601(b)(2) (750 ILCS 5/601(b)(2) (West 1994)), noting that the record indicated the father had only allowed the grandparents to maintain "temporary care" of his daughter. *Dile*, 248 Ill. App. 3d at 685-86.

Just as the grandparents in *Dile* could not confer standing upon themselves by refusing to relinquish the child to her father, intervenors in the instant case cannot gain standing where defendant has refused plaintiff's requests for Roxanne's return. The father in *Dile* maintained contact with his daughter and indicated that, while he would allow the grandparents to temporarily care for her, he wanted custody. In the instant case, both parents maintained contact with Roxanne. Plaintiff and intervenors agreed that the situation was meant to be temporary, and both parents had indicated that when they were able they would like to care for Roxanne.

Intervenors also rely on *In re Custody of Bozarth*, 182 Ill. App. 3d 345 (1989), where the court found that the paternal grandmother had standing to petition for custody of her granddaughter. However, in *Bozarth*, the grandmother had been caring for the child for approximately three years. The whereabouts of the child's mother, who had abandoned the child as an infant, were unknown, and the child's father lived in another state. *Bozarth*, 182 Ill. App. 3d at 352. In contrast, intervenors had physical possession of Roxanne for about 20 months before initiating these proceedings. During that time, both parents visited the child and contributed financially to her care and they both indicated they planned to take Roxanne when so able. We find that, under these circumstances, the trial court's finding that neither plaintiff nor defendant voluntarily relinquished custody of Roxanne to the Furmans as required by section 601(c) was not contrary to the manifest weight of the evidence.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO, P.J., and RAKOWSKI, J., concur.