*In re* MARRIAGE OF RHONDA K. HOUGHTON, Petitioner, and WALTER W. HOUGHTON, Respondent-Appellant (Maurine Kay Winkler, Intervenor-Appellee).

Fourth District   No. 4—98—0168

Opinion filed November 16, 1998.—Rehearing denied January 25, 1999.

COOK, J., dissenting.

Talmadge G. Brenner, of Quincy, for appellant.

John T. Inghram IV, of Inghram & Inghram, of Quincy, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:
In March 1995, the trial court entered a judgment dissolving the

marriage between petitioner, Rhonda K. Houghton, and respondent, Walter W. Houghton, and granting Walter sole custody of their daughter, Destiny. In May 1996, pursuant to an agreement between Walter and Rhonda, the court granted Rhonda sole custody of Destiny. In December 1997, following Rhonda's death, the trial court granted the petition of intervenor, Maurine Kay Winkler (Kay), Rhonda's mother, to modify custody and to make Kay Destiny's custodian.

Walter appeals, arguing that (1) Kay lacked standing under section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601(b)(2) (West 1996)) to file a petition to modify custody; (2) the trial court's order was void because Kay never filed a petition to modify custody; and (3) the court erred by (a) granting Kay's petition to modify custody, and (b) restricting Walter's visitation with Destiny. We agree with Walter's first argument and reverse.

## I. BACKGROUND

Because the parties are familiar with the evidence presented during the hearing on Kay's petition, we discuss it only to the extent necessary to put Walter's lack of standing argument in context.

Walter and Rhonda were married in April 1991. During their marriage, they had one child, Destiny, born March 21, 1994. In June 1994, Walter began serving a two-year prison sentence for obstructing a police officer. Kay testified that while Walter was in prison, Destiny stayed at Kay's home. Kay stated that "[o]nce in awhile[,] Rhonda would come and get her, but not very often."

In October 1994, Rhonda filed a petition for dissolution of marriage, and in November 1994, Walter filed a cross-petition for dissolution of marriage. In December 1994, Walter was released from prison. Immediately upon his release, Walter picked up Destiny from her baby-sitter, and Destiny once again began living with Walter. During that same month, Rhonda dismissed her dissolution petition because she and Walter had reconciled. However, Walter proceeded with his cross-petition, and in March 1995, the trial court entered a judgment dissolving the marriage and granting Walter sole custody of Destiny.

Following their divorce, Walter and Rhonda reconciled and lived together off and on. From the time of the dissolution judgment in March 1995 until May 1996, Walter was Destiny's sole legal custodian. Throughout most of that time, Destiny also lived with him. Kay testified that in February 1996, Walter dropped off Rhonda and Destiny at Kay's home, and he did not pick them up until May 1996. Walter disputed this, claiming that he took Rhonda and Destiny to Kay's home because Rhonda wanted to move out. He agreed that Rhonda could keep Destiny with her for two weeks. When Rhonda refused to

bring Destiny back to him at the end of the two-week period, Walter asked the Adams County sheriff's department to retrieve Destiny for him, and it did.

In May 1996, Walter and Rhonda agreed that Rhonda could have sole custody of Destiny, and they filed a joint petition to modify custody accordingly. Pursuant to their agreement, the trial court granted the petition and awarded Rhonda sole custody of Destiny. Walter testified that he agreed to transfer custody of Destiny to Rhonda because he and Rhonda were going to remarry and "Rhonda basically wanted that as *** some sort of a nail in the wall to hold our relationship together." Between May 1996 and March 1997, Walter and Rhonda lived together off and on. Although Destiny usually lived with Rhonda during that time period, Kay testified that Walter sometimes had "physical custody" of Destiny as opposed to Rhonda.

On March 9, 1997, Rhonda died in an automobile accident. Later that same day, Walter located Destiny, who had been staying with some nonrelatives, and took her to live with him. On March 25, 1997, Walter filed a petition to reestablish his custody of Destiny, which the trial court granted. From the time of Rhonda's death until the trial court's granting of Kay's petition to modify custody in December 1997, Destiny lived with Walter and visited with Kay every other weekend, pursuant to an agreement between Walter and Kay.

In November 1997, the trial court conducted a hearing on Kay's petition. In December 1997, the court granted the petition, awarded Kay custody of Destiny, and granted Walter restricted visitation with Destiny. This appeal followed.

## II. ANALYSIS

### A. The Petition To Modify Custody

Initially, we note Walter's argument that the trial court's December 1997 order was void because Kay never filed a petition to modify custody in these proceedings. Kay concedes that the record here does not contain a copy of her petition to modify custody that had been file-stamped by the clerk of court. Nonetheless, she contends that the record indicates that she actually filed her petition. Specifically, she points to the following: (1) a June 1997 written order specifically mentioned a "[p]etition to [m]odify filed by M. Kay Winkler"; (2) in August 1997, Walter filed a motion to continue which stated that "[t]here is currently pending before this [c]ourt a [m]otion to [c]hange [c]ustody of the parties' minor child from the father to the maternal grandmother"; and (3) the record discloses no objection or complaint from Walter that he had not received a copy of Kay's petition.

Although it appears that Kay's response to Walter's argument

that she never filed a petition to modify custody may be soundly based, we decline to address it further. Because of our resolution of this case, we need not decide this matter.

## B. Standing

Walter also argues that Kay lacked standing under section 601(b)(2) of the Act (750 ILCS 5/601(b)(2) (West 1996)) to file a petition to modify custody. In response, Kay argues that Walter has forfeited the issue of standing by failing to raise it until after the November 1997 hearing on Kay's petition. Alternatively, Kay argues that she had standing under section 601(b)(2). We agree with Walter that Kay lacked standing.

## 1. *Forfeiture*

■ Lack of standing under section 601(b)(2) of the Act is an affirmative defense which is forfeited unless raised in a motion to dismiss during the time for pleading. *In re Marriage of Sechrest*, 202 Ill. App. 3d 865, 874, 560 N.E.2d 1212, 1217 (1990). In *Sechrest*, 202 Ill. App. 3d at 875, 560 N.E.2d at 1218, this court held that the natural parent had forfeited the issue of standing by raising the issue for the first time in a posttrial motion after three years had passed with the child in the custody of third parties. In so holding, this court wrote the following:

> "We seek to make clear under the Act the Kennedys, as third parties, did not have standing to petition for custody of [the child]. To prevent such situations in the future, *trial courts must carefully examine the pleadings and may, sua sponte if necessary, raise the issue of a nonparent's standing or lack of standing.*" (Emphasis added.) *Sechrest*, 202 Ill. App. 3d at 875, 560 N.E.2d at 1218.

■ In the present case, it is undisputed that Walter first raised the issue of Kay's lack of standing in a motion to reconsider the trial court's December 1997 order granting her petition. However, despite Walter's failure to raise the standing issue at the November 1997 hearing, evidence was presented on that issue at that hearing, and the court specifically addressed it in its subsequent ruling. In its December 1997 written order, the court specifically found that "the maternal grandmother herein [(Kay)] has standing to pursue her [p]etition to [m]odify pursuant to the requirements of [s]ection 601(b)(2) of the [Act]."

We commend the court for addressing this issue, consistent with this court's decision in *Sechrest*. Thus, because the court *sua sponte* addressed and ruled upon the issue of Kay's standing under section 601(b)(2) of the Act, we conclude that Walter has not forfeited that issue.

Our conclusion is consistent with the underlying purpose of the forfeiture doctrine—that is, to preserve finite judicial resources by creating an incentive for litigants to bring issues to the trial courts' attention, thereby giving courts an opportunity to consider those issues. See *People v. McKay*, 282 Ill. App. 3d 108, 111, 668 N.E.2d 580, 583 (1996). As earlier discussed, although Walter did not bring the issue of standing to the trial court's attention, the court—by its own initiative—did consider the issue. Moreover, we note that the court's *sua sponte* consideration of Kay's standing under section 601(b)(2) of the Act comports with the notion that the termination of parental rights is an extraordinary measure that may warrant considering issues without resorting to doctrines of judicial convenience, such as forfeiture. See *In re Y.B.*, 285 Ill. App. 3d 385, 390, 674 N.E.2d 819, 821-22 (1996).

In addition, we note that Kay does not contend on appeal (nor did she before the trial court, for that matter) that she would suffer prejudice if the issue of standing was deemed not forfeited. See *In re Custody of McCarthy*, 157 Ill. App. 3d 377, 380-81, 510 N.E.2d 555, 557 (1987) (trial court has discretion to allow tardy filing of a motion to dismiss challenging standing *unless* it can be demonstrated that the opposing party was prejudiced by the late filing).

Although we conclude that Walter has not forfeited the issue of Kay's lack of standing, we nonetheless do not condone his failure to raise the issue in a timely motion to dismiss.

### 2. *Merits*

■■ Section 601(b)(2) of the Act provides, in relevant part, as follows:

"(b) A child custody proceeding is commenced in the court:
\*\*\*

(2) by a person other than a parent, by filing a petition for custody of the child \*\*\* *but only if he is not in the physical custody of one of his parents*." (Emphasis added.) 750 ILCS 5/601(b)(2) (West 1996).

The superior right of a natural parent to custody of his child is recognized and protected in the Act by requiring a nonparent seeking custody to meet the standing requirement embodied in section 601(b)(2) of the Act (750 ILCS 5/601(b)(2) (West 1996)) before being considered for custody under the best interests standard set forth in section 602 of the Act (750 ILCS 5/602 (West 1996)). See *In re Petition of Kirchner*, 164 Ill. 2d 468, 491, 649 N.E.2d 324, 334-35 (1995); *In re Marriage of Brownfield*, 283 Ill. App. 3d 728, 732, 670 N.E.2d 1198, 1201 (1996). To establish standing, a nonparent has the burden of showing that a child is "not in the physical custody of one of his

parents" before she can seek custody of the child. 750 ILCS 5/601(b)(2) (West 1996); see also *Kirchner*, 164 Ill. 2d at 490-91, 649 N.E.2d at 334-35; *In re Marriage of Rudsell*, 291 Ill. App. 3d 626, 632, 684 N.E.2d 421, 425 (1997).

The determination that a parent does not have physical custody of his child turns not on possession; rather, it requires that that parent "somehow has *voluntarily* and *indefinitely relinquished custody of the child.*" (Emphasis added.) *Kirchner*, 164 Ill. 2d at 491, 649 N.E.2d at 335; see also *In re Custody of Peterson*, 112 Ill. 2d 48, 52-53, 491 N.E.2d 1150, 1152 (1986). However, not every voluntary turnover of a child will deprive the parent of physical custody. The trial court must consider factors such as (1) who was responsible for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physical possession of a child was acquired; and (3) the nature and duration of the possession. See *Kirchner*, 164 Ill. 2d at 493, 649 N.E.2d at 336; *Rudsell*, 291 Ill. App. 3d at 632, 684 N.E.2d at 425. A reviewing court will disturb a trial court's decision in a custody proceeding only if it was against the manifest weight of the evidence or will result in manifest injustice. *Franklin v. DeVriendt*, 288 Ill. App. 3d 651, 655-56, 681 N.E.2d 578, 581 (1997).

■ The record is clear that Walter never "voluntarily and indefinitely" relinquished his right to the care, custody, and control of Destiny. Even assuming that Rhonda had relinquished physical custody of Destiny to Kay while Walter was imprisoned between June 1996 and December 1996 (when Rhonda and Walter were still married), Rhonda's *unilateral* relinquishment could not be imputed to Walter. See *Kirchner*, 164 Ill. 2d at 493, 649 N.E.2d at 335 ("A unilateral relinquishment by one parent cannot serve as the basis for establishing standing under section 601(b)(2) as against the other parent"). In addition, both Kay and Walter testified that immediately upon Walter's release from prison in December, he retrieved Destiny from her baby-sitter and took her to live with him and Rhonda.

■ We also reject Kay's contention that Walter voluntarily and indefinitely relinquished physical custody of Destiny to her when he left Rhonda and Destiny at Kay's home in February 1996. The length of time Rhonda and Destiny stayed with Kay is disputed (according to Kay, it was three months; according to Walter, it was two weeks). Regardless, considering that Walter had sole legal custody of Destiny at that time and Rhonda continued to live with Destiny, it would be unreasonable to expect Walter to think that Kay had physical custody of Destiny. Moreover, it is undisputed that Walter exhibited interest in Destiny when he secured the assistance of the sheriff's department to retrieve her from Kay's residence.

In May 1996, Walter agreed to transfer custody of Destiny to Rhonda because he wanted to remarry Rhonda, and Rhonda wanted some showing of his sincerity. Following Walter and Rhonda's agreement to transfer custody of Destiny to Rhonda, Walter and Rhonda lived together off and on until Rhonda's death in March 1997. Kay acknowledged that during that time period, Walter sometimes had "physical custody" of Destiny as opposed to Rhonda. Importantly, even when Walter and Rhonda were not living together during that time period, Rhonda and Destiny never lived with Kay. Instead, Destiny simply visited her on weekends and some weekdays.

> " 'Overnight contact with third parties fails to fulfill the statutory provision that the child not be in the physical custody of one of her parents. \*\*\* We do not accept petitioner's theory that physical custody may be relinquished by default if a parent performs the task of parenting in a less than adequate manner.' " *Sechrest*, 202 Ill. App. 3d at 873, 560 N.E.2d at 1216-17, quoting *In re Custody of Barokas*, 109 Ill. App. 3d 536, 544, 440 N.E.2d 1036, 1042 (1982).

See also *In re Custody of O'Rourke*, 160 Ill. App. 3d 584, 587, 514 N.E.2d 6, 8 (1987) (despite third parties' weekly and often daily care of the children, the legal custody of the children remained with the mother until her death, at which point it transferred to the father).

On March 9, 1997, the day Rhonda died, Walter found Destiny at a nonrelative's house and took her to live with him. On March 25, 1997, Walter filed a petition to reestablish custody of Destiny, which the trial court granted. See *In re Marriage of Gustafson*, 181 Ill. App. 3d 472, 481, 536 N.E.2d 1359, 1364 (1989) (Green, J., specially concurring) (if a noncustodial parent consistently shows interest in his child and promptly seeks custody upon the death of the custodial parent, courts will imply a constructive physical custody in favor of the noncustodial parent).

We acknowledge the deferential standard under which we must review a trial court's decision in a custody proceeding. However, after carefully reviewing the record before us in accordance with the appropriate standard of review, we conclude that the court's finding that Kay had standing under section 601(b)(2) of the Act (750 ILCS 5/601(b)(2) (West 1996)) because Walter had voluntarily relinquished custody of Destiny was against the manifest weight of the evidence.

.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.

Reversed.

KNECHT, J., concurs.

JUSTICE COOK, dissenting:

The standing requirement of section 601(b)(2) of the Act is designed to protect the superior natural right of parents. If one of the parents has physical custody of the child, a nonparent may not bring an action to contest that parent's right to continuing custody under the best-interests-of-the-child standard of section 602; instead, unfitness must be proved under the comparatively strict standard of the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1996)) or the Adoption Act (750 ILCS 50/1 *et seq.* (West 1996)). *Gustafson*, 181 Ill. App. 3d at 475, 536 N.E.2d at 1360; Uniform Marriage and Divorce Act § 401, Comment, 9A U.L.A. 264 (1998). However, where the parents are not actually raising the children, where the child "is not in the physical custody of one of his parents," section 601(b)(2) allows a nonparent to petition for custody.

It is the situation that exists at the time the petition is filed, or immediately before it is filed, which is important. Kay's petition was filed in late 1997. The fact that Kay had custody in 1994 while Walter was in prison or that Walter had custody in 1995 or that Rhonda had custody in 1996 is not particularly relevant.

The fact that after Rhonda's death "Walter located Destiny, who had been staying with some nonrelatives, and took her to live with him" is not controlling. 301 Ill. App. 3d at 782. Mere physical possession of the child at the time custody litigation is initiated will not be enough, because a court will not tolerate abduction of the minor to satisfy the literal terms of the standing requirement. *Peterson*, 112 Ill. 2d at 53-54, 491 N.E.2d at 1152-53; *Rudsell*, 291 Ill. App. 3d at 633, 684 N.E.2d at 426; *In re Custody of Menconi*, 117 Ill. App. 3d 394, 453 N.E.2d 835 (1983) (father forcibly removed child four days before petition filed).

Was Destiny in the physical custody of one of her parents before Kay's petition was filed? The trial court's order makes it clear that Walter did not have physical custody. "The court finds that respondent has had little contact with the minor child until the death of the petitioner on March 15, 1997," that after he was released from jail in December 1996, respondent resided with his grandparents, then with a male friend and female friend, then with a different female friend.

Did Rhonda have physical custody before her death? The problem with allowing the issue of standing to be raised after the evidence has been taken is that it is unlikely the evidence will do much more than touch on the issue. There was evidence that Rhonda did not have physical custody. At the time of Rhonda's death Destiny had been "staying with some nonrelatives." It would have been helpful to have known some details of that stay. There was also testimony that Rhonda did not continuously have physical custody of Destiny in the months before her death, that Walter and others sometimes had "physical custody," although the trial court found that Walter's relationship with the child did not amount to "physical custody."

The majority sees it as important that, even when Walter and Rhonda were not living together in the period before Rhonda's death, "Rhonda and Destiny never lived with Kay." 301 Ill. App. 3d at 782. It is irrelevant whether Destiny lived with Kay. What is important is whether Destiny lived with one of her parents. If she did not, for example, if she was in the physical custody of an aunt, or was in no one's physical custody, simply moving from house to house after a few days' stay, then Kay and anyone else had standing to file a petition for custody.

When one parent has legal custody, the custodian cannot destroy the rights of the noncustodian by giving up the child to a third party. That is what *Kirchner* meant when it said the determination that a parent does not have physical custody turns not on possession; rather, it requires that that parent somehow has voluntarily and indefinitely relinquished custody of the child. *Kirchner*, 164 Ill. 2d at 491, 649 N.E.2d at 335. *Kirchner*, however, where the mother told the father the child was dead and then gave the child up for adoption, is a very different case from this one. See *Brownfield*, 283 Ill. App. 3d at 740, 670 N.E.2d at 1206 (Cook, J., specially concurring). In a case like this one, if a mother has legal custody but allows the child to be raised by others, the father cannot justify his inaction by the fact that the mother and not he had legal custody. If the mother allows the child to be in the physical custody of third parties and the father does not object, then the father "has voluntarily and indefinitely relinquished custody of the child."

Because Walter did not raise the issue of standing until after the evidence had been presented, the evidence on standing is sparse in this case. Nevertheless, there was some evidence to support the trial court's decision, and I cannot say that decision was contrary to the manifest weight of the evidence. A decision is contrary to the manifest weight of the evidence when an opposite conclusion is apparent or when the findings are unreasonable, arbitrary or not based on the evi-

dence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274 (1996). That is not the case here. A lack of evidence does not make apparent a conclusion opposite to that of the trial court. It is improper for this court to draw inferences, even from uncontested facts, contrary to those drawn by the trial court, for example, where the majority (1) points to the conflict in evidence on how long Rhonda and Destiny stayed with Kay; (2) states that it would be unreasonable to expect Walter to think that Kay had physical custody of Destiny; and (3) concludes that Walter agreed to transfer custody of Destiny only as a showing of his sincerity in wanting to remarry Rhonda. 301 Ill. App. 3d at 782. The trial court was very concerned about the relationship between Walter and the child here, not just awarding custody to Kay, but restricting Walter's visitation.

*Sechrest* urged the trial court to raise the issue of standing *sua sponte*, during the time for pleading, after which the issue is waived. *Sechrest*, 202 Ill. App. 3d at 873-75, 560 N.E.2d at 1217-18. The trial court did not raise the issue during the time for pleading here. When the issue was finally raised the trial court considered it and rejected it, based on the limited evidence presented. The trial court reached the same result in ruling on the issue that it would have reached if it had found the issue waived. If the trial court had been inclined to find the other way it may very well have allowed Kay to reopen the evidence. The majority opinion overturns the decision of the trial court based on the following facts: (1) Walter never "voluntarily and indefinitely relinquished his right to custody," (2) Destiny's stay with Kay in 1994 and at other times was not sufficient for Kay to have physical custody, (3) Walter had physical custody in 1994, and (4) after Rhonda's death Walter took Destiny from the nonrelatives with whom she had been staying. Those facts are discussed above. The majority's analysis does not address the key question, whether Rhonda had physical custody at the time of her death.

It is not clear that Destiny was in the physical custody of a parent before this petition was filed. That being the case, we should accept the decision of the trial court finding standing. A standing requirement is useful as a rough filter to prevent the filing of petitions by those who have no legitimate interest in the care of the child, but is poorly suited to resolving real disputes between those who do have such an interest. Deciding these cases by a standing requirement is similar to attempting to decide every case by summary judgment. In fact, it is worse because a motion for summary judgment looks to the issues in the case, while the standing requirement addresses only the artificial issue whether the child is "in the physical custody of one of his parents." Broad application of the standing requirement of section

601(b)(2) will result in awards contrary to the best interests of the child. A standing requirement is unnecessary to protect the natural rights of the parent. Even where the court decides the case under the best-interests-of-the-child standard, it still will give considerable weight to the right of the natural parent. *In re Custody of Townsend*, 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234 (1981); *Rudsell*, 291 Ill. App. 3d at 633, 684 N.E.2d at 426. This is not a termination-of-parental-rights case, despite the majority's characterization. 301 Ill. App. 3d at 780.