*In re* MARRIAGE OF CARA L. RUDSELL, Petitioner-Appellant, and ERIC L. RUDSELL, Respondent (Chrystal J. Millage *et al.*, Intervenors-Appellees; Louie Wood *et al.*, Intervenors).

Fourth District   No. 4—97—0235

Argued July 22, 1997.—Opinion filed August 29, 1997.

Robert J. Rillie (argued), of Aledo, for appellant.

Thomas E. Cady (argued), of Katz, McHard, Balch, Lefstein & Fieweger, P.C., of Rock Island, for appellees.

JUSTICE COOK delivered the opinion of the court:

On May 31, 1995, Chrystal Millage filed a petition to modify custody in these proceedings, in which Eric and Cara Rudsell had previously been divorced and the custody of their daughter, Elizabeth, had been awarded to Cara. The circuit court first found that Chrystal and her husband William had standing pursuant to section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601(b)(2) (West 1994)), and then on January 14, 1997, modified its previous order and awarded custody of Elizabeth to them. Cara appeals. We affirm.

Cara and Eric Rudsell were married July 6, 1990. Two children were born during the marriage, Heather, August 1, 1991, and Elizabeth, January 20, 1993. In March 1992, Heather entered the hospital with bronchial pneumonia. After her release, Cara turned Heather over to Cara's parents, Louie and Judith Wood, because Cara did not

have heat in her home. Cara took Heather back for a time, but when Heather reentered the hospital, Cara again turned Heather over to the Woods. Judith testified that at first Cara visited Heather every Sunday, but visitation fell off to maybe once a month in the wintertime. Sometimes Cara took Heather for periods of several weeks, but then would call and ask the Woods to pick Heather up, without giving any explanation. Heather remained with the Woods until April 1995.

Cara met William and Chrystal Millage in 1991 through Eric, who was a friend of the Millages' son. Eric lived with the Millages in early 1992, and Chrystal testified she fed Eric and Cara "most every night" while Cara was pregnant. Elizabeth was born by cesarean section. Before the birth, Cara asked Chrystal to take care of the baby for several weeks while she recuperated, and Chrystal agreed. Chrystal testified she offered to let Cara stay with them as well, but Cara declined. Chrystal testified that, when Elizabeth was two weeks old, Cara took her for an overnight but brought her back the next day and said "You can have this damn brat from hell, she bawled all night, the next thing I had her, shaking her." Cara denied that.

Elizabeth remained with the Millages after Cara had recovered from the operation. Cara testified she did not retrieve Elizabeth because Eric had become violent and abusive. Eric told Cara to choose between him and Elizabeth. That is also why Cara had left Heather with the Woods. Cara stated Eric was not Elizabeth's natural father, and he resented the child's presence in the home. Eric later told Chrystal he might be the child's natural father, and the trial court decided, for purposes of these proceedings, that it would assume Eric is Elizabeth's natural father.

In the months after Elizabeth was born, Cara visited the Millages two or three times per week and occasionally took Elizabeth to the Woods' home. Judith testified she saw Elizabeth with Cara every weekend early in the year she was born, but as summer approached, the visits decreased to around two per month. Chrystal likewise testified Cara's visits became less frequent, with periods of over a month between visits at one point. Cara took Elizabeth and stayed with the Woods for almost a week in September 1993, perhaps also in September 1994.

In February 1994, Cara and Eric took Elizabeth to a bar in the evening. Judy Stocks, an acquaintance of Eric and Cara, was present. She testified Cara arrived between 7:30 and 8 p.m. and stayed until 10 p.m. Stocks testified Elizabeth's clothing and face were dirty. Stocks called William Millage, who came and took Elizabeth home. Stocks asked Cara why Elizabeth was still with the Millages, and

Cara replied the trailer needed to be cleaned up, the power was off, and it was too cold. Stocks testified she asked Cara, "Why didn't she go and get her *** or was she just going to give Elizabeth to them?" According to Stocks, Cara replied, "What difference does it make? They already have her." Cara testified she would have to "figure something out" before Elizabeth started school.

The Millages took Elizabeth on vacations out of state, with Cara's permission. Initially, Cara took Elizabeth to the doctor as necessary. Later Chrystal took Elizabeth to the doctor, using public aid Cara received for Elizabeth's health care. Chrystal asked Cara's permission before taking Elizabeth to the doctor. Cara provided no financial support for Elizabeth, other than one bag of old clothing, and food stamps until Elizabeth was one year old.

Cara testified she told Chrystal several times she was going to get Elizabeth when she was ready, and Chrystal said that's fine, you can come get her when you want to. Cara said she was gullible to believe that. Judith Holmgren prepared a home study of Cara, the Wood household, and the Millage household on behalf of Lutheran Social Services. The Millages stated they did not intend to seek custody when Elizabeth first entered their home. However, Chrystal told Holmgren that they had since bonded with the child and wanted to keep her. William told Holmgren that Cara and the Woods would get the child "over my dead body." Carolyn Geertz, Chrystal's mother, testified the child related to Chrystal as if Chrystal were her mother.

According to Holmgren's report, the Millages had had prior experience with foster children. Chrystal's parents had two foster children who were returned to their biological parents. Chrystal wrote a letter to the biological parents stating she would help the mother, if Chrystal would be allowed to have some sort of relationship with the children. The two children wound up living with Chrystal for one year. The natural mother visited every other weekend until a social worker convinced the natural mother she should retrieve the children. The children were later returned to foster care, for which the natural mother blamed the Millages. Chrystal told Holmgren the Millages never "went the legal route with Elizabeth" because their experience made them afraid of scaring Cara.

Chrystal testified Cara did not see Elizabeth over Christmas 1994 or on Elizabeth's birthday in January 1995. Cara testified she attempted to contact Elizabeth on her birthday, but the Millages were not home. She testified she gave Elizabeth her birthday and Christmas gifts later in January, when she and Elizabeth visited Cara's parents. According to Chrystal, Cara visited the Millages only five times from January to April 1995. In February 1995, Cara left

Eric and moved from the trailer home to a house in Bald Bluff, Illinois, where she began living with a man named Doug Seaton. The Millages testified they found out three weeks later that she had moved, and it was a week after that before they were able to locate her again. Cara testified she did contact the Millages after her move but admitted it was perhaps a month before she did so.

There was testimony Cara did not make any serious effort for the return of Elizabeth in the first two years of Elizabeth's life. Chrystal testified that Cara spoke of taking Elizabeth permanently in the future but never asked for Elizabeth's permanent return. Cara sometimes spoke of giving up custody to Chrystal. Cara testified she tried to get Elizabeth back in February 1995—she told Chrystal she would be back to get her as soon as Cara's plumbing was redone, and Chrystal said that would be fine, but the plumbing was not done when Chrystal's petition to modify was filed. Cara testified she had taken Elizabeth to her home at times, and the Millages would always come get her and say something like they had a birthday party to take her to, and then not bring her back. Cara never asked the Millages for an explanation of their failure to return Elizabeth. Judith testified she warned Cara the Millages would take Elizabeth away from her if Cara didn't keep her more, but Cara said she couldn't because of Eric.

Cara argues she had the physical custody of Elizabeth immediately before the Millages filed their petition, but the Millages got Elizabeth back by a ruse. On March 28, 1995, Cara and Eric signed papers agreeing to the entry of a judgment of dissolution. At that time, according to Cara, she told the Millages she wanted them to surrender Elizabeth to her, which they did. Cara testified she also picked up Heather in April 1995. Cara had Elizabeth for three days, until the Millages "showed up, and they wanted to take her for like to the park or something, so I said okay." The Millages never brought Elizabeth back and instead filed this action on May 31, 1995. The three-day period she had Elizabeth in March 1995 was the longest period Cara, by herself, had cared for Elizabeth. Cara admitted she did not take Elizabeth's clothes from the Millages on March 28. Chrystal denied that Cara ever told her when she picked up Elizabeth that she was taking her permanently. Chrystal denied she ever tried to keep Elizabeth away from Cara. Chrystal filed the petition to modify because she heard Cara was going to move to Missouri and pick up Elizabeth and take her with her, and Chrystal did not want to lose her.

On May 31, 1995, Chrystal Millage filed her petition for custody. The next day, Cara agreed to an order that Chrystal would have

temporary custody, pending a hearing. On June 15, 1995, after Cara had obtained counsel, the court continued temporary custody in Chrystal.

On October 5, 1995, Cara married Doug Seaton. On November 15, 1995, Cara gave birth to a daughter, Samantha, by Doug. Doug is roughly $8,000 in debt in back child support payments for two children from a previous relationship. Doug told Holmgren he pled guilty to a charge of battery seven years ago. According to Holmgren's report, none of the references Doug and Cara gave to Holmgren were very familiar with Cara, and one actually recommended against giving Doug custody of a three-year-old child. On April 21, 1996, Cara returned Elizabeth from visitation with bruises. Elizabeth hurt herself while Doug was baby-sitting her when she fell off a file cabinet. Doug and Cara called Chrystal, who then took Elizabeth to the doctor. The Department of Children and Family Services told Cara not to leave the children alone with Doug, but it did no followup after the initial report. Judith also testified Elizabeth had burns when she returned from a visit with the Millages. William testified she probably got these burns by jumping on their son's motorcycle while he and the son were working on it.

In the meantime, on October 11, 1995, the Woods had filed a petition to intervene, seeking that they be awarded the custody of Elizabeth. Intervention was at first allowed, but the court later reversed itself. On December 11, 1996, the guardian *ad litem* filed a report recommending that custody be awarded the Millages, on the basis that stability of environment was more important here than the natural right of the mother. The guardian *ad litem* recommended that Cara be given liberal visitation. On January 14, 1997, the circuit court awarded custody of Elizabeth to the Millages. The court noted that when it had awarded custody to Cara in the dissolution proceedings Cara had stated under oath that she had custody of Elizabeth. The court found that Cara had voluntarily surrendered custody to Chrystal, that Chrystal had provided practically all of the day-to-day care of Elizabeth, and there was no credible proof of any hindrance to Cara's taking custody during the $2^{1}/_{2}$ years after the birth of Elizabeth. The court recognized the strong presumption in favor of the natural parent but found the presumption had been overcome. The court found that Cara had allowed a mother-child relationship to arise between Chrystal and Elizabeth, that Cara had contributed nothing to the financial support of Elizabeth, that there were doubts as to Cara's mental stability in that she had allowed both her children to live with others most of their lives, that there was no reasonable explanation why Cara let this situation continue, and that Cara

failed to visit with her child on a regular basis and failed to maintain any significant degree of parental involvement for the first $2^1/2$ years of the child's life. The court stated the primary reason for its ruling was the desire to maintain some continuity in the child's life. The court refused to find Cara unfit and ordered that Cara have reasonable visitation.

■ Section 601(b)(2) of the Act provides a child custody proceeding is commenced "by a person other than a parent, by filing a petition for custody of the child *** *but only if he is not in the physical custody of one of his parents.*" (Emphasis added.) 750 ILCS 5/601(b)(2) (West 1994). This language requires nonparents seeking custody to demonstrate the child is not in the physical custody of one of his parents. See *In re Custody of Peterson*, 112 Ill. 2d 48, 52-53, 491 N.E.2d 1150, 1152 (1986). The standing requirement applies to motions to intervene as well as initial custody petitions. *In re Marriage of Nicholas*, 170 Ill. App. 3d 171, 176, 524 N.E.2d 728, 731 (1988); *In re Parentage of Unborn Child Brumfield*, 284 Ill. App. 3d 950, 954, 673 N.E.2d 461, 464 (1996).

■ The determination that a parent does not have physical custody of a child turns not on possession; rather, it requires that that parent somehow has voluntarily and indefinitely relinquished custody of the child. *In re Petition of Kirchner*, 164 Ill. 2d 468, 491, 649 N.E.2d 324, 335 (1995). Not every voluntary turnover of a child will deprive the parent of physical custody, however. The court must consider factors such as (1) who was responsible for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physical possession of a child was acquired; and (3) the nature and duration of the possession. *In re Marriage of Santa Cruz*, 172 Ill. App. 3d 775, 783, 527 N.E.2d 131, 136 (1988); *In re Marriage of Brownfield*, 283 Ill. App. 3d 728, 735-36, 670 N.E.2d 1198, 1203-04 (1996); *Kirchner*, 164 Ill. 2d at 493, 649 N.E.2d at 335-36.

■ The trial court's determination that Cara voluntarily relinquished physical custody to the Millages is clearly correct. There can be no dispute that Cara's turnover of the child was voluntary. Furthermore, this was not a babysitting arrangement or otherwise limited arrangement. The Millages very quickly became the persons responsible for the care and welfare of the child. Cara argues that her original intent was that the Millages would have Elizabeth only for a few weeks, and she never changed that intent, although she kept putting off the time when she would resume responsibility for the child, citing *Franklin v. Devriendt*, 288 Ill. App. 3d 651 (1997), where a finding there was no standing was affirmed. *Franklin* did note that the parties there intended the intervenors' care of the

child, which ended up lasting a year and eight months, to be a temporary situation. In *Franklin*, however, the father cared for the child on a daily basis while the child lived with intervenors (the father's mother and her husband), and provided financial support as well. *Franklin*, 288 Ill. App. 3d at 655. The *Franklin* court also found that the trial court's decision was not contrary to the manifest weight of the evidence, and we do the same here. *Franklin*, 288 Ill. App. 3d at 657. At some point, a series of temporary justifications is no longer a credible explanation, and a trier of fact can reasonably conclude that a parent no longer intends a living arrangement to be temporary. It is not necessary that the parent intend to permanently relinquish custody; an intent to indefinitely relinquish custody is sufficient. *Kirchner*, 164 Ill. 2d at 491, 649 N.E.2d at 335.

■ We are concerned with the argument that Cara had physical custody before the Millages filed their petition and that the Millages obtained possession of Elizabeth by a ruse. The abduction of a minor in order to satisfy the literal terms of the standing requirement will not be tolerated. *Peterson*, 112 Ill. 2d at 53-54, 491 N.E.2d at 1152-53. In *In re Custody of Menconi*, 117 Ill. App. 3d 394, 453 N.E.2d 835 (1983), the court found standing where a father left a child with his parents for almost six years, then forcibly removed the child from his parents' home four days before they filed a petition for custody. In the present case, however, the trial court did not believe Cara when she testified the Millages had the child at the time of filing only by deceitfully telling Cara they wanted to visit with the child. The evidence fully supports the trial court's finding. Chrystal testified Cara did not tell her she was taking the child back permanently on March 28, and Cara did not attempt to pick up the child's clothes at that time. Cara testified she only had the child for three days, and she did not explain why she did not attempt to get the child back from the Millages before May 31, two months later, when they filed their petition.

■ Even if a nonparent is found to have standing and the case is decided under the best interest of the child standard, the court will still give considerable weight to the right of the natural parent. *In re Custody of Townsend*, 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234 (1981). The wishes of the child's parent is the first factor listed under section 602(a) of the Act. 750 ILCS 5/602(a)(1) (West 1994). A third party seeking to obtain or retain custody of a child over the superior right of the natural parent must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody *and* further must show that it is in the child's best interests that the third party be awarded the care, custody and control of the

minor. *Townsend,* 86 Ill. 2d at 510-11, 427 N.E.2d at 1235-36; *People ex rel. Edwards v. Livingston,* 42 Ill. 2d 201, 208-09, 247 N.E.2d 417, 421 (1969). If the only reason for preferring the Millages over Cara was the "desire to maintain some continuity in the child's life," we would question whether the presumption in favor of the natural parent had been overcome. Sometimes children are reunited with a parent after the parent has spent years in a hospital or years overseas, for example, on military duty. *Townsend* held that the desire for stability and continuity, however important it may be in a given case, does not rise to the level of a presumption so as to neutralize the superior right doctrine or transpose the superior right from the natural parent to the third person. *Townsend,* 86 Ill. 2d at 515, 427 N.E.2d at 1237-38.

Although the trial court described continuity as the primary reason for its decision, the trial court referred to other factors as well. The court was concerned with Cara's attitude toward her responsibilities as a mother, noting that she had left both her children with others for most of their lives and that Cara had failed to maintain any significant degree of parental involvement for the first $2^1/2$ years of Elizabeth's life. There was testimony that Cara did not show much interest in Elizabeth even during visitation. There was some evidence that Cara's husband was not a good person to have around young children. There was testimony that Cara had made improvements in her life, that her housekeeping skills had improved, that her parenting skills have improved now that she is raising Heather, and that she is closer to her family now that Eric, whom her family did not like, is gone. There was also testimony, however, that the Millages' home is an appropriate place in which Elizabeth could be raised. There was testimony that Cara got along well with Elizabeth, but there was also testimony the Millages got along well with Elizabeth.

We cannot say that the trial court's decision that the Millages had standing, or that it was in the best interests of the child to award custody to the Millages, was against the manifest weight of the evidence. See *In re Custody of McCuan,* 176 Ill. App. 3d 421, 427, 531 N.E.2d 102, 106 (1988); *In re Marriage of Siklossy,* 87 Ill. App. 3d 124, 128, 409 N.E.2d 29, 32 (1980). We affirm both the trial court's finding the Millages had standing and the trial court's ultimate decision to award the Millages custody.

Affirmed.

STEIGMANN, P.J., and McCULLOUGH, J., concur.