In re J.M.

[750 A.2d 442]

No. 99-374

February 22, 2000. Mother and stepfather appeal from a family court judgment terminating mother's residual parental rights and denying stepfather's request for custody of the minor, J.M. Stepfather contends the court: (1) erroneously failed to treat him as a parent; and (2) made clearly erroneous findings of fact. Mother joins in stepfather's arguments, and further contends the court's findings and conclusions concerning her physical condition were clearly erroneous. We affirm.

The family court's findings may be summarized as follows. The family has a lengthy history with the Department of Social and Rehabilitation Services dating from December 1992, when SRS filed a petition alleging that J.M., who was then one month old, was a child in need of care and supervision. Mother and J.M.'s father separated during this period and were later divorced. Mother began living with stepfather in early 1993. They had four children together: two sons, Se.Y. and Sc.Y., born in August 1993 and September 1994, respectively, who were also the subject of the TPR proceeding, and two daughters, born in May 1996 and December 1997, who remain with the parents. Mother and stepfather married in 1998.

The parties stipulated to CHINS in January 1993, and the court ordered protective supervision and required mother to participate in a variety of parent-education programs. Following a merits hearing in May 1995, the court found that J.M. and his two stepbrothers were CHINS based upon evidence of filthy and unkempt conditions in the home that rendered it unsafe for the children. SRS social workers observed no sheets in the

cribs, dirty clothes and rotten food covering the floors, potentially dangerous items within reach of the children, and one child with dried feces caked to his lower back and bottom. The court placed the children in stepfather's custody with protective supervision, ordered mother to move out until she could safely transition back into the home, and required both mother and stepfather to participate in parent-education services.

During the next year, the three boys were removed periodically from the home as a result of continued neglect. They were removed for the last time in June 1996, and have remained in foster care ever since. Over the next year and a half, the caseplan continued to call for reunification and parenting services for mother and stepfather. SRS workers reported that mother did not cooperate with the parenting program and that mother and stepfather were unable to safely supervise the children during visits. Although stepfather was working fulltime, he served as the primary caretaker. SRS workers reported that he had progressed in his parenting skills, but not enough to safely parent the children.

In January 1998, SRS moved to terminate residual parental rights with respect to J.M., Se.Y., and Sc.Y. In May of that year, J.M. moved into a home with foster parents interested in adoption. The court found that the foster parents have been a positive force in J.M.'s life, having demonstrated an ability to deal with his special needs.

Stepfather moved to intervene in the proceeding to terminate mother's parental rights to J.M., noting that he had earlier been granted custody of the minor and arguing that he had effectively functioned as the child's psychological parent. The court consolidated the TPR proceedings involving Se.Y., Sc.Y., and J.M., but denied the motion to grant stepfather

party status as to J.M. Pursuant to V.R.C.P. 54(b), the court granted stepfather's motion for a final judgment on his claim for party status, and he thereupon appealed the ruling to this Court. We dismissed the appeal, noting that V.R.C.P. 54 does not apply to CHINS cases, and that the issue was not unreviewable on appeal from a final judgment under V.R.A.P. 5.1.

The TPR hearing took place over six days between January and March 1999, and included the testimony of numerous SRS caseworkers, service providers, visitation supervisors, foster parents, a psychologist who had evaluated the family, mother, and stepfather. During the course of the hearing, stepfather moved for custody and guardianship of J.M. The court issued extensive written findings and conclusions in July 1999, granting the petition to terminate mother's residual parental rights to J.M., and denying stepfather's request for custody. This appeal followed.

Stepfather renews his claim that the court erred in declining his request to be accorded party status as J.M.'s de facto parent and in failing, accordingly, to apply the statutory criteria for the termination of residual parental rights under 33 V.S.A. § 5540. Because the statutory scheme governing juvenile proceedings does not expressly define "parent," stepfather contends the common law governs, and that under the common law one who stands in loco parentis to a child acquires the status of a parent in a termination proceeding. The claim overlooks the distinction between parents and stepparents that runs throughout our statutory scheme. See, e.g., 15A V.S.A. §§ 4-101—4-113 (setting forth requirements for stepparent's adoption of stepchild); 15 V.S.A. § 293 (setting forth provision for courts to award custody where parents or stepparents live separately); 15 V.S.A. § 296 (setting forth stepparent's duty to support stepchild residing in same household). Absent a clear legislative directive, we decline to judicially expand the meaning of parent to subsume a stepparent, psychological parent, or any other person claiming in loco parentis authority in a TPR proceeding. See *Titchenal v. Dexter*, 166 Vt. 373, 385, 693 A.2d 682, 689 (1997) (declining to recognize custody and visitation right of de facto parents where "the Legislature is better equipped to deal with the problem"); see also *In re Agnes P.*, 800 P.2d 202, 204-05 (N.M. Ct. App. 1990) (declining to extend parental status in termination proceeding to persons claiming in loco parentis standing).

The several cases upon which stepfather relies do not suggest otherwise. *Paquette v. Paquette*, 146 Vt. 83, 85-88, 499 A.2d 23, 26-27 (1985), construed 15 V.S.A. § 652 to allow a court to award custody to a stepparent in a divorce proceeding where the statutes otherwise allowed such an order when the stepparent and natural parent were still married or had separated. *In re Fowler*, 130 Vt. 176, 180, 288 A.2d 463, 466 (1972), recognized that a stepparent standing in loco parentis to his stepchildren could operate to disqualify the children from receiving welfare benefits. *Ormsby v. Rhoades*, 59 Vt. 505, 511, 10 A. 722, 725-26 (1887), held that a nephew could not recover for services from his uncle, who stood in loco parentis to the nephew. None of these decisions even remotely supports a potentially limitless interpretation of the term parent to include any third person claiming in loco parentis status in a TPR proceeding.

In ruling on stepfather's claim, we do not address whether he should have been accorded party status in support of mother's rights. The record indicates that stepfather did not seek such status, but instead sought a parental right of his own that had to be terminated within the proceeding. In any event, as the father of Se.Y. and Sc.Y., he was able to participate in the termination proceeding, and any

denial of party status as to J.M. was therefore harmless.

Stepfather also claims that the court made several clearly erroneous findings which resulted in the denial of his motion for custody of the child. In this regard, stepfather appears to argue at the threshold that he was presumptively entitled to custody because he stood in loco parentis to the child. We discern no statutory requirement or other authority, however, for the court to exercise a preference in favor of anyone other than the child's parents, a status which — as noted — did not apply to stepfather. The court's findings in a termination proceeding will be upheld unless they are clearly erroneous, and its conclusion will be affirmed if supported by the findings. *In re B.S.*, 166 Vt. 345, 350, 693 A.2d 716, 719 (1997). Stepfather challenges the court's finding that he was not in a position to take on the responsibility of caring for J.M. and attending to the child's special needs, in part, because stepfather had extensive other responsibilities working fulltime, caring for his mother-in-law, and also attending to the special needs of mother and their two young daughters. The testimony of numerous service providers and other experts, however, amply supported these findings. Father's speculative testimony that he would have been willing to quit his job if awarded custody did not undermine these findings.

Stepfather further contends the evidence failed to support the court's finding that he was unable to read, and challenges the relevance of his literacy to the best interests of the child. The record evidence, which included a forensic evaluation by Dr. John Donnelly, a clinical psychologist, fully supported the court's finding that stepfather's borderline cognitive abilities, in part illustrated by his limited ability to read or write, coupled with stepfather's extensive other responsibilities, rendered him unable to care for J.M. These findings were supported by the evidence and plainly relevant to the best interests of the child.

Stepfather also challenges the court's finding that he was unable to set limits for J.M. Again, the testimony of various service providers amply attested to the chaos that prevailed in the home. Finally, stepfather challenges a number of "potentially material" findings, including the court's findings that there was "garbage" in the home during one visit by an SRS caseworker (stepfather claims that it was actually laundry), that one of J.M.'s siblings drank from a bottle of Tylenol found on the floor (stepfather claims that the child never actually drank from the bottle), that SRS encountered difficulty in getting stepfather to follow through on service recommendations, and that stepfather showed sporadic compliance with the SRS caseplan. The record discloses conflicting testimony as to whether the bags observed by the service provider contained laundry or garbage, and the SRS worker acknowledged that she did not actually see the child drink the Tylenol, but only observed him attempt to drink from the bottle. Any slight inaccuracy in the court's findings in this regard, however, is more than offset by the extensive other evidence demonstrating the parties' extreme neglect of the children's welfare, safety, and cleanliness. See *In re L.A.*, 154 Vt. 147, 157, 574 A.2d 782, 788 (1990) (we will not reverse decision absent showing that prejudice flowed from error). Furthermore, although the court candidly acknowledged that stepfather had made sporadic progress in his parenting skills at various points in time, the overall record amply supported its conclusion that he had not made sufficient progress to adequately care for the child. Accordingly, we find no error in the court's findings warranting reversal.

In a separate appeal, mother contends that the court's findings reflect a lack of understanding of, and hostility toward, her disability. Mother suffers from a dis-

order of nerve and muscle function known as myotonic dystrophy, which causes weakness and fatigue, and affects motor skills. Mother cites several of the court's findings that referred to testimony by service providers concerning mother's physical inertia, and claims that the court improperly relied on such testimony as evidence of "bad parenting." Nothing in the record or the findings supports this claim. The court's conclusions were based upon findings, amply supported by the record, indicating that she had not come close to conforming with the expectations in the caseplans, that she had stubbornly refused to maintain a clean and safe home, and that she had exhibited a "global" pattern of deficiencies which rendered her incapable of resuming her parental responsibilities within a reasonable period of time.

Mother also contends that the evidence failed to support the court's finding that mother's perception of her medical condition limited her ability to perform day-to-day tasks. Contrary to mother's claim, the court's finding did not suggest that mother's perception was inaccurate, or that mother used her disability as an illegitimate excuse for inactivity. Mother also contends the court's finding that she demonstrated a stubborn refusal to maintain a clean home was unsupported by the evidence, demonstrated gender bias (implying that it was her responsibility to do so), and again reflected a misunderstanding of her disability. The record and findings do not support mother's claims. The record was replete with evidence of filth, clutter, and hazardous home conditions that the court characterized as appalling, and with testimony concerning mother's persistent refusal to cooperate with service providers, to participate in parenting programs, or to assist stepfather, who was forced to attempt the role of primary care provider while working fulltime. This was the basis of the court's decision. There is no evidence to support mother's claim that the court blamed her for her physical limitations, or burdened her with unreasonable or stereotyped expectations. Accordingly, we find no error.

*Affirmed.*