2010 ND 40

**Mark Alexander McALLISTER, Plaintiff, Appellee and Cross–Appellant**

v.

**Robin Marie McALLISTER, Defendant, Appellant and Cross–Appellee**

and

**Michael J. Tharaldson, Defendant.**

No. 20090176.

Supreme Court of North Dakota.

March 16, 2010.

**654**

Melinda Hanson Weerts, Fargo, ND, for plaintiff, appellee and cross-appellant.

L. Patrick O'Day, Fargo, ND, for defendant, appellant and cross-appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Robin McAllister appealed, and Mark McAllister cross-appealed, from the district court's judgment in this divorce. The district court granted decisionmaking responsibility and primary residential responsibility for E.M., who is Robin McAllister's biological child and Mark McAllister's stepchild, to Robin McAllister.[1] The district court also found Mark McAllister is E.M.'s psychological parent and granted him reasonable visitation. The district court further ordered Robin McAllister to invite Mark McAllister to school events and provide him with progress reports. Finally, the district court found Mark McAllister "is entitled to all legal rights

---

1. When appropriate, this opinion uses the language of the amended Chapter 14–09, N.D.C.C., although the case was decided under the prior law. *See Machart v. Machart*, 2009 ND 208, ¶ 1 n. 1, 776 N.W.2d 795 (citing 2009 N.D. Sess. Laws ch. 149, §§ 4, 8).

set forth in § 14–09–28 of the North Dakota Century Code." We affirm the district court's judgment that exceptional circumstances exist justifying reasonable visitation for Mark McAllister. The district court's finding that Mark McAllister has the rights listed in N.D.C.C. § 14–09–28 is not clearly erroneous because the rights relate to communication and visitation.

## I.

[¶ 2] Robin McAllister conceived a child, E.M., with Michael Tharaldson. While she was pregnant, Robin McAllister moved out of Tharaldson's home. She met Mark McAllister and moved in with him. After E.M. was born in 2002, Robin McAllister and Mark McAllister raised him together. Robin McAllister and Mark McAllister married in 2004 and had two children. In 2008, Robin McAllister left Mark McAllister. She took E.M. with her, while leaving the two younger children with Mark McAllister. Robin McAllister and E.M. moved in with Jason Prosje, with whom Robin McAllister previously had a relationship. Mark McAllister filed for divorce in March 2008, naming Robin McAllister and Tharaldson as defendants. Robin McAllister and Mark McAllister resolved all the issues of the divorce, except custody of E.M., by stipulation.

[¶ 3] After Robin McAllister left Mark McAllister, she informed E.M. that Tharaldson, not Mark McAllister, was his biological father. Tharaldson's paternity of E.M. was established by the district court in 2003, and his parental rights have not been terminated. Tharaldson was ordered to pay three thousand dollars per month in child support. The district court also established a graduated schedule of parenting time for Tharaldson. Robin McAllister testified Tharaldson has remained current on his child support payments and exercised parenting time with E.M. until E.M.

was age two, then again after the McAllisters separated.

[¶ 4] Mark McAllister retains primary residential responsibility of the two younger children, with scheduled parenting time for Robin McAllister. Regarding his relationship with E.M., he testified, "I have been there since E.M. was born. I took [Robin McAllister] to doctor's visits. I love E.M. E.M. is the same as my other two children." E.M. always has, and continues to, refer to Mark McAllister as "Dad" or "Daddy." Mark McAllister requested decisionmaking responsibility and primary residential responsibility of E.M.:

> I want custody of E.M. because I love him. Because he is my oldest kid and he has always been my oldest kid. I worry about his well-being and I worry about him being taken care of. And I worry about him growing up to be a good functioning member of society and being happy. I don't think Robin can do that. I think that she can clothe him and feed him, but I don't think that psychologically she can help him when he needs help.

[¶ 5] Robin McAllister testified she believed Mark McAllister was away for work and left her alone with the children too much during the marriage. When she left Mark McAllister, she took E.M. with her "because he is not Mark's biological child." She believed leaving her two other children with Mark McAllister "would be best for them." In her opinion, it would be best for E.M. "to stay with his mother, and . . . limit the visitation a little bit with Mark so that he has time to adjust to things going on in his life like Mike [Tharaldson] wanting visitation, like the new home life with Jason [Prosje] and [Prosje's daughter] and mommy being happier."

[¶ 6] The custody investigator testified she believed Robin McAllister had a "strong bond" with E.M., but questioned

her "ability to consistently provide a strong, nurturing relationship to her son." The custody investigator's concern was based on Robin McAllister's history of depression and the consistency of her treatment for her mental health needs. She had no concern about Mark McAllister's ability to consistently maintain a strong bond with E.M. The custody investigator also testified Robin McAllister is "very capable of being a good mother." She testified it is important for E.M. to "maintain regular contact" with both Robin McAllister and Mark McAllister "because that's his family, it's important to him." According to the custody investigator, E.M. considers Mark McAllister to be his father. She testified Mark McAllister is E.M.'s psychological parent. However, she did not believe E.M. would suffer any detriment or harm if primary residential responsibility was granted to Robin McAllister. The custody investigator recommended decisionmaking responsibility and primary residential responsibility should remain with Robin McAllister, with "fairly liberal" visitation for Mark McAllister, including allowing E.M. to attend McAllister family functions. She also recommended that Robin McAllister should inform Mark McAllister of all of E.M.'s school functions and list Mark McAllister as an emergency contact for E.M.

[¶ 7] In its Supplemental Memorandum Opinion, Amended Findings of Fact, Conclusions of Law and Order for Judgment the district court stated, "[T]here is no evidence that Robin is an 'unfit' parent." The district court further noted the custody investigator "did *not* believe [E.M.] to be at risk of serious harm or detriment in his mother's custody." (Emphasis in original). The district court concluded a best interests analysis was unnecessary and granted decisionmaking responsibility and primary residential responsibility to Robin McAllister, but also stated Mark McAllis-

ter has the "right to be considered a psychological parent with legal standing and significant visitation rights."

[¶ 8] The district court discussed Mark McAllister's role in E.M.'s life:

A person who provides a child's daily care and who, thereby, develops a close bond and personal relationship with the child becomes the psychological parent of what [sic] child to whom the child turns to for love, guidance, and security. Here, Mark, on a day to day basis from the time of [E.M.]'s birth through March 6, 2008, and again through regular visitation, has been that person to [E.M.]. Mark has fulfilled [E.M.]'s psychological needs for a parent as well as [E.M.]'s physical needs. . . .

As a psychological parent, Mark should be granted liberal visitation rights. This visitation will not only further the bond between Mark and [E.M.], but also foster the bond between the three young brothers, the youngest two whom reside with Mark.

Thus, Mark is entitled to all legal rights set forth in Section 14–09–28 of the North Dakota Century Code.

The district court made the following findings of fact:

1. It is in the best interest of the minor child, [E.M.], . . . that his legal and physical custody be given to his mother, Robin, soon to be Robin Marsolek.

2. Mark is a physiological [sic] parent to [E.M.] and entitled to reasonable visitation and related rights as follows:

   A. Every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m., these weekends to coincide with the weekends that Mark retains custody of [M.M.] and [N.M.].

   B. Two non-consecutive uninterrupted weeks during the summer, again

to coincide with weeks that Mark also retains custody of [M.M.] and [N.M.];

C. Every other Thursday after school at approximately 2:42 p.m. to 7:00 p.m.; and

D. Part of Christmas Day for the McAllister family Christmas and, if not mutually agreed to, specifically 10:00 a.m. to 3:00 p.m. Christmas Day.

3. Robin must/will invite Mark to special school events for [E.M.], so Mark can attend and bring [M.M.] and [N.M.] when appropriate.

4. Robin must/will provide Mark with [E.M.]'s progress reports, which includes but is not limited to, copies of report cards, written medical and dental reports, etc.

5. As a psychological parent Mark is entitled to all legal rights set forth in § 14–09–28 of the North Dakota Century Code.

[¶ 9] In its original Memorandum Opinion, Findings of Fact, Conclusions of Law and Order for Judgment, the district court also granted Mark "the right to obtain all necessary medical and dental care for [E.M.] including psychological counseling and psychiatric care, if applicable." This language was removed after a hearing was held in April 2009 and does not appear in the district court's final opinion. The district court explained its reasoning during the April hearing:

I was intending to give him specifically all these special information rights, for E.'s good, not to Robin's detriment, but for E's benefit and Mark's benefit, and the bonding group of the boys with Mark, just because he would be seeing so much of E. in the context of seeing him with the boys, but the access to information. Not the right to make de-

terminations as to care, those would be Robin's under my decision.

[¶ 10] The district court's decision in this case was not intended to affect Tharaldson's parental rights or duties. The district court explained, "[L]egal and physical custody of [E.M.] should remain with Robin, noting that Michael [Tharaldson] may have some existing legal rights established in the prior paternity case. Nothing in this Memorandum Opinion is intended to affect Michael [Tharaldson]'s support obligations towards [E.M.]"

II.

[¶ 11] Robin McAllister argues the district court's finding that Mark McAllister is E.M.'s psychological parent is clearly erroneous. Robin McAllister also argues the district court's granting of the rights listed in N.D.C.C. § 14–09–28 to Mark McAllister is clearly erroneous because it ignores the parental rights of Tharaldson, and E.M. being placed with Robin McAllister poses no risk of serious detriment or harm to E.M. Finally, Robin McAllister argues the amount of visitation granted to Mark McAllister is excessive.

[¶ 12] Mark McAllister argues the district court's finding that he is E.M.'s psychological parent, and the district court's granting him visitation and the rights listed in N.D.C.C. § 14–09–28, are not clearly erroneous. Mark McAllister argues further, however, that the district court's granting of decisionmaking responsibility and primary residential responsibility to Robin McAllister is clearly erroneous.

[¶ 13] This Court uses the following standard when considering custody determinations:

An award of custody is a finding of fact which this Court will not disturb unless it is clearly erroneous. *Hamers v. Guttormson,* 2000 ND 93, ¶ 4, 610

N.W.2d 758. Under N.D.R.Civ.P. 52(a), a finding of fact is clearly erroneous only if it is induced by an erroneous view of the law or, although there is some evidence to support it, on the entire record we are left with a definite and firm conviction a mistake has been made. *Id. Interest of D.P.O.*, 2003 ND 127, ¶ 6, 667 N.W.2d 590.

## A.

[¶ 14] Robin McAllister argues the district court's finding that Mark McAllister is E.M.'s psychological parent is clearly erroneous. We have recently explained:

It is well-settled that parents have a paramount and constitutional right to the custody and companionship of their children superior to that of any other person. That right, however, is not absolute, and in custody disputes between a natural parent and a third party exceptional circumstances may require, in the child's best interests to prevent serious harm or detriment to the child, that the child be placed in the custody of a third party rather than with the natural parent. While this Court has not attempted to narrowly define or circumscribe the exceptional circumstances which must exist to permit a court to consider placing custody of a minor child with a third party rather than with the natural parent, each case in which such a placement has been upheld by this Court has involved a child who has been in the actual physical custody of the third party for a sufficient period of time to develop a psychological parent relationship with that third party.

*Edwards v. Edwards*, 2010 ND 2, ¶ 8, 777 N.W.2d 606 (quoting *Hamers*, 2000 ND 93, ¶ 5, 610 N.W.2d 758).

[¶ 15] We have previously described the role of a psychological parent:

"A person who provides a child's daily care and who, thereby, develops a close bond and personal relationship with the child becomes the psychological parent to whom the child turns for love, guidance, and security." *Hamers*, 2000 ND 93, ¶ 5, 610 N.W.2d 758 (citing *Patzer v. Glaser*, 396 N.W.2d 740, 743 (N.D.1986)). A psychological parent finding is not dispositive in custody determinations, however:

Establishment of a psychological parent relationship does not end the trial court's inquiry in making a custody decision, but merely furnishes a justification for the award of custody to a party other than the natural parent. *Daley v. Gunville*, 348 N.W.2d 441, 445 (N.D.1984). When a psychological parent and a natural parent each seek a court-ordered award of custody, the natural parent's paramount right to custody prevails unless the court finds it in the child's best interests to award custody to the psychological parent to prevent serious harm or detriment to the welfare of the child. *Cox v. Cox*, 2000 ND 144, ¶ 22, 613 N.W.2d 516; *Simons v. Gisvold*, 519 N.W.2d 585, 587 (N.D.1994).

*D.P.O.*, 2003 ND 127, ¶ 6, 667 N.W.2d 590.

[¶ 16] Here, Mark McAllister clearly provided E.M.'s daily care and thereby, developed a close bond and personal relationship with E.M. *Hamers*, 2000 ND 93, ¶ 5, 610 N.W.2d 758 (citing *Patzer*, 396 N.W.2d at 743). Mark McAllister, along with Robin McAllister, raised E.M. from birth. Before the McAllisters' separation, Mark McAllister was the only father E.M. knew. E.M. "has been in the actual physical custody of the third party for a sufficient period of time to develop a psychological parent relationship with that third party." *Edwards*, 2010 ND 2, ¶ 8, 777 N.W.2d 606 (quoting *Hamers*, at ¶ 5). The district court's conclusion that Mark McAllister is E.M.'s psychological parent is not

induced by an erroneous view of the law and is supported by the record.

## B.

[¶ 17] Although the district court determined Mark McAllister is E.M.'s psychological parent, it granted decisionmaking responsibility and primary residential responsibility to Robin McAllister. Mark McAllister argues this finding is clearly erroneous.

[¶ 18] As stated above, the establishment of a psychological parent relationship can constitute exceptional circumstances justifying the placement of decisionmaking responsibility and primary residential responsibility to a person other than a natural parent. *D.P.O.*, 2003 ND 127, ¶ 6, 667 N.W.2d 590 (citing *Daley*, 348 N.W.2d at 445). Here, the district court noted the custody investigator's testimony that she did not believe E.M. was at risk of harm or detriment if decisionmaking responsibility and primary residential responsibility were granted to Robin McAllister. The district court then stated, "[A] best interest analysis is not appropriate here so as to deprive Robin of primary physical custody." The district court also repeatedly asserted Robin McAllister is not "unfit."

[¶ 19] Mark McAllister argues the district court's repeated references to parental fitness show its decision was induced by an erroneous view of the law. In *Mansukhani v. Pailing*, 318 N.W.2d 748 (N.D. 1982), the district court included the following statement in its memorandum opinion:

> They [Donald and Jean] contend that they need not show that the mother is unfit and overlook the ruling of the Supreme Court case requiring the balancing of the paramount rights of a biological parent with the best interests of the children. However most of the trial time was consumed in attempting to show the weakness and faults of the mother. They have failed to persuade this Court that she is an unfit mother or that she would not be a good mother in the best interests of the children.

*Mansukhani*, 318 N.W.2d at 751 (alteration in original). We stated:

> We believe the court's foregoing statement demonstrates that it focused on a parental fitness test which is an incorrect application of the law in a custody dispute such as this between a natural parent and a third party (i.e. the children's grandparents). Jenny's fitness as a parent is not at issue and is not the test. The test is whether or not there are exceptional circumstances which require that in Jennifer and Allen's best interests they be placed in the custody of their grandparents rather than with their biological mother.

*Id.*

[¶ 20] Here, as in *Mansukhani*, the district court referred to the mother's parental fitness. The district court stated:

> The test is not whether Mark would use better judgment or would even be a better parent; but initially, whether she is fit, and whether exceptional circumstances exist in that leaving [E.M.] with her would be detrimental and harmful to his welfare in the present case, those circumstances simply do not exist.

The district court's assertion that it must first determine whether Robin McAllister is a fit parent is incorrect. *Mansukhani*, 318 N.W.2d at 751. The district court ultimately applied the proper test, however, stating E.M. was not at risk of serious harm or detriment if placed in Robin McAllister's care. *D.P.O.*, 2003 ND 127, ¶ 6, 667 N.W.2d 590 (citing *Cox*, 2000 ND 144, ¶ 22, 613 N.W.2d 516; *Simons*, 519 N.W.2d at 587). The district court mis-

stated the test to be used, but its decision was not induced by an erroneous view of the law.

## C.

[¶ 21] While Mark McAllister was not granted decisionmaking responsibility and primary residential responsibility of E.M., he was granted reasonable visitation. Robin McAllister concedes Mark McAllister should have some visitation, but argues the amount of visitation the district court granted Mark McAllister is excessive. She asserts she, as the natural parent, should decide the amount of visitation Mark McAllister can exercise. This Court has previously discussed a district court's authority to grant visitation to non-parents:

> We believe the authority for awarding visitation to a non-parent emanates from our previous decisions concerning child custody and visitation. . . . The rationale for awarding custody to the grandparents is the existence of exceptional circumstances which will further the best interests of the child. *Daley, supra* 348 N.W.2d at 443–444. It is appropriate to extend the application of that same rationale to the award of visitation to a non-parent. . . . It is clear from the above-cited cases that the paramount concern in awarding visitation to a non-parent is the best interests of the child. *See* Annot., 1 A.L.R.4th 1270 (1980). This court stated in *Muraskin v. Muraskin*, 336 N.W.2d 332, 336 (N.D.1983), a case involving the modification of visitation rights of a noncustodial parent: "Visitation privileges are created to promote the best interests of the child."

*Quirk v. Swanson,* 368 N.W.2d 557, 560 (N.D.1985).

[¶ 22] Here, we have determined the district court's finding that Mark McAllister is E.M.'s psychological parent is not clearly erroneous. The existence of a psychological parent relationship can constitute exceptional circumstances justifying the placement of decisionmaking responsibility and primary residential responsibility with a third party. *Edwards,* 2010 ND 2, ¶ 8, 777 N.W.2d 606 (citing *Hamers,* 2000 ND 93, ¶ 5, 610 N.W.2d 758). A district court can grant decisionmaking responsibility and primary residential responsibility to a third party "to prevent serious harm or detriment to the child." *D.P.O.,* 2003 ND 127, ¶ 6, 667 N.W.2d 590 (citing *Cox,* 2000 ND 144, ¶ 22, 613 N.W.2d 516; *Simons,* 519 N.W.2d at 587). Granting reasonable visitation to a third party is a lesser intrusion on a parent's constitutional right to the custody and companionship of their children than granting decisionmaking responsibility and primary residential responsibility to a third party.

[¶ 23] The district court found E.M. was not at risk of serious harm or detriment if placed in Robin McAllister's care. This finding was in response to Mark McAllister's request for decisionmaking responsibility and primary residential responsibility of E.M. This finding does not preclude the district court from granting reasonable visitation to Mark McAllister. It is not inconsistent for the district court to recognize that it is not necessary to award primary residential responsibility to Mark McAllister rather than Robin McAllister to prevent serious harm or detriment to E.M. and to also recognize that it is necessary to award reasonable visitation to Mark McAllister to prevent serious harm or detriment to E.M. Because granting reasonable visitation to a third party is a lesser intrusion on the parent's constitutional rights, the same showing of serious harm or detriment is not required. Mark McAllister's psychological parent relationship with E.M. is an exceptional circumstance that justifies this lesser intrusion on

Robin McAllister's constitutional rights as E.M.'s natural parent. The district court granted Mark McAllister visitation every other weekend, every Thursday, two weeks in the summer, and part of Christmas day. This is not an excessive amount of visitation for E.M.'s psychological parent to exercise. The district court's granting of visitation to Mark McAllister was not induced by an erroneous view of the law, and is supported by the record.

[¶ 24] Robin McAllister, Mark McAllister, and Tharaldson may have a difficult time complying with the judgments granting reasonable visitation to both Mark McAllister and Tharaldson. Tharaldson has not appealed, and in its supplemental memorandum opinion, the district court did not specifically address the parenting time previously granted to Tharaldson. The best interests of a child as young as E.M. may not be well served by having him stay in three different homes with three different "parents" each week. District courts should consider stability for the child and the practical implications for the parties when determining a parenting schedule.

### D.

[¶ 25] Robin McAllister argues the district court's finding that "[a]s a psychological parent Mark is entitled to all legal rights set forth in § 14–09–28 of the North Dakota Century Code" is clearly erroneous. The parental rights that were listed in N.D.C.C. § 14–09–28 at the time this divorce commenced are now listed in N.D.C.C. § 14–09–32. *See* 2009 N.D. Sess. Laws ch. 149, §§ 4, 12 (repealing N.D.C.C. § 14–09–28 and creating N.D.C.C. § 14–09–32). Section 14–09–28, N.D.C.C., listed the following "[p]arental custody and visitation rights and duties":

1.  Each parent of a child has the following custody and visitation rights and duties:
    a.  Right to access and obtain copies of the child's educational, medical, dental, religious, insurance, and other records or information.
    b.  Right to attend educational conferences concerning the child. This right does not require any school to hold a separate conference with each parent.
    c.  Right to reasonable access to the child by written, telephonic, and electronic means.
    d.  Duty to inform the other parent as soon as reasonably possible of a serious accident or serious illness for which the child receives health care treatment. The parent shall provide to the other parent a description of the serious accident or serious illness, the time of the serious accident or serious illness, and the name and location of the treating health care provider.
    e.  Duty to immediately inform the other parent of a change in residential telephone number and address.
    f.  Duty to keep the other parent informed of the name and address of the school the child attends.

[¶ 26] We discussed rights granted to a stepparent in *Edwards*. We determined some of the rights granted to the stepfather related to decisionmaking authority, while other rights related to the stepfather's visitation and communication. *Edwards*, 2010 ND 2, ¶ 13, 777 N.W.2d 606. We reversed the granting of rights related to decisionmaking, while affirming the granting of rights related to visitation and communication. *Id.* The rights listed in N.D.C.C. § 14–09–28 relate to visitation and communication, not decisionmaking. The district court granted Mark McAllis-

ter the right to access information, not the right to make any decisions regarding E.M. The district court's finding that Mark McAllister has "all legal rights set forth in § 14–09–28 of the North Dakota Century Code" is not induced by an erroneous view of the law and is supported by the record.

## III.

[¶ 27] We affirm the district court's judgment finding Mark McAllister is E.M.'s psychological parent, Robin McAllister has decisionmaking responsibility and primary residential responsibility of E.M., and Mark McAllister has reasonable visitation and the rights listed in N.D.C.C. § 14–09–28.

[¶ 28] DALE V. SANDSTROM and CAROL RONNING KAPSNER, JJ., concur.

CROTHERS, Justice, specially concurring.

[¶ 29] I concur in the result based on what I believe is the majority's careful, albeit expanding, application of our precedent. By definition that precedent consists of ad hoc adjudication of third-party claims for child custody or visitation. I write separately to express concern that our body of law being propagated ad judicium has resulted, and will continue to result, in the judiciary being pulled deep into the legislature's policymaking domain.

[¶ 30] We know without citation to authority that adult relationships sometimes disintegrate and that children are often involved in those relationships. We know from research that millions of children live with adults other than their parents. *See* Gupta–Kagan, *Children, Kin, and Court: Designing Third Party Custody Policy To Protect Children, Third Parties, and Parents*, 12 N.Y.U. J. Legis. & Pub. Pol'y 43 (2008). "Nearly 14 million children live with third parties—adults other than their parents—and the number of children primarily cared for by third parties has been growing. Before determining which of the millions of third parties who are significantly involved in children's lives should obtain custody, one must first determine which situations commonly require custody orders and thus when third parties ought to have standing to seek custody." *Id.* at 48 (footnotes omitted).

[¶ 31] The North Dakota Legislature has addressed only a small part of this issue by providing for grandparent and great-grandparent visitation of an unmarried minor and for temporary custody pending adoption by the grandparent or an aunt or uncle. N.D.C.C. § 14–09–05.1(1) and N.D.C.C. § 14–10–05.[2] The remainder of the law regulating non-parent custody and non-grandparent visitation has been established by judicial decision. *See Edwards v. Edwards*, 2010 ND 2, ¶¶ 11–13, 777 N.W.2d 606 (affirming grant of visitation rights but reversing grant of decision making authority to child's stepfather); *Clark v. Clark*, 2005 ND 176, ¶¶ 16–17, 704 N.W.2d 847 (reversing grant of temporary custody to child's grandparents where district court did not conduct best interests analysis to determine whether

**2.** This case does not involve grandparent or great-grandparent visitation. Therefore, my references to "third-party custody or visitation" does not include grandparent or great-grandparent visitation under N.D.C.C. § 14–09–05.1(1). Nor does this case involve grandparent or aunt or uncle custody pending adoption, and my references to "third-party custody or visitation" should not be considered to include situations arising under N.D.C.C. § 14–10–05. However, beyond these limitations, "third-party custody or visitation" could well include these family members and other long-term caregivers such as step-parents and spouses or partners of the children's parent.

exceptional circumstances existed); *In re D.P.O.*, 2003 ND 127, ¶ 12, 667 N.W.2d 590 (affirming grant of custody to child's biological father despite maternal grandparents' petition for custody); *In re R.K.*, 2002 ND 111, ¶¶ 12–14, 646 N.W.2d 699 (reversing temporary custodial placement with maternal grandparents because no explanation given why child's father should not be granted custody); *Hamers v. Guttormson*, 2000 ND 93, ¶¶ 9–10, 610 N.W.2d 758 (affirming grant of custody to child's biological mother despite paternal grandfather's petition for custody); *Cox v. Cox*, 2000 ND 144, ¶¶ 22–25, 613 N.W.2d 516 (granting custody of child to father despite mother's argument that prospective adoptive parents had become child's psychological parents); *In re Lukens*, 1998 ND 224, ¶ 8, 587 N.W.2d 141 (denying grandparents' petition for custody of child where no psychological parent relationship was established); *Goter v. Goter*, 1997 ND 28, ¶¶ 9–10, 559 N.W.2d 834 (reversing grant of child's custody to aunt and uncle because district court correctly determined aunt and uncle were child's psychological parents but applied incorrect legal standard for placing custody of a child with a third party); *In re E.J.H.*, 546 N.W.2d 361, 364 (N.D.1996) (declining to extend concept of psychological parent to include child's extended family); *Simons v. Gisvold*, 519 N.W.2d 585, 587–88 (N.D.1994) (affirming grant of child's custody to biological mother following biological father's death and stepmother's application for custody); *Matter of Guardianship and Conservatorship of Nelson*, 519 N.W.2d 15, 19–20 (N.D.1994) (granting custody to stepmother-figure and visitation to aunt when children's mother abandoned them and children's father passed away); *Dinius v. Dinius*, 448 N.W.2d 210, 212 (N.D.1989) (holding psychological parent concept is applicable only in custody determinations between a natural parent and another par-ty who is not a natural parent); *Worden v. Worden*, 434 N.W.2d 341, 342–43 (N.D. 1989) (reversing grant of child's custody to stepfather because no exceptional circumstances warranted depriving child's mother of custody); *Patzer v. Glaser*, 396 N.W.2d 740, 743–44 (N.D.1986) (granting custody of child to mother despite grandparents' role as psychological parents); *Patzer v. Glaser*, 368 N.W.2d 561, 564–65 (N.D.1985) (remanding to determine if grandparents' relationship with child constituted exceptional circumstances); *In re J.K.S.*, 356 N.W.2d 88, 93 (N.D.1984) (affirming order of district court terminating mother's parental rights and authorizing adoption of child by foster parents who had become psychological parents); *Daley v. Gunville*, 348 N.W.2d 441, 446–47 (N.D.1984) (granting custody of child to grandmother who had become psychological parent and awarding child's mother liberal visitation); *Schneider v. S.L.M.*, 347 N.W.2d 126, 130–31 (N.D.1984) (comparing existence of psychological parent in adoption proceeding to custody proceeding); *In re Buchholz*, 326 N.W.2d 203, 207 (N.D.1982) (granting custody of child to mother instead of paternal aunt and uncle because no exceptional circumstances existed justifying best interests analysis); *Mansukhani v. Pailing*, 318 N.W.2d 748, 755–56 (N.D.1982) (granting custody to child's grandparents who had become psychological parents); *In re D.R.J.*, 317 N.W.2d 391, 394 (N.D.1982) (holding exceptional circumstances exist when child's psychological parent is pitted against child's natural parent in custody dispute); *Hust v. Hust*, 295 N.W.2d 316, 322–23 (N.D.1980) (reversing temporary grant of custody to child's grandparents because no exceptional circumstances existed where mother had properly cared for and retained physical custody of child until removal by court order); *In re D.R.J.*, 295 N.W.2d 401, 410–11 (N.D.1980) (reversing grant of physical custody to child's mother

and directing district court to grant physical custody to child's grandmother who had become psychological parent); *In re J.O.*, 250 N.W.2d 256, 258–59 (N.D.1977) (declining to stay district court order granting temporary custody to child's grandparents where parents could not provide stable living conditions for child); *In re D.G.*, 246 N.W.2d 892, 895–96 (N.D. 1976) (awarding custody of child to maternal grandparents who had become psychological parents).

[¶ 32] Research indicates North Dakota is in the minority of jurisdictions that judicially recognize third-party custody or visitation claims absent legislation. *See In re Marriage of Rudsell*, 291 Ill.App.3d 626, 225 Ill.Dec. 736, 684 N.E.2d 421, 426 (1997) ("A third party seeking to obtain or retain custody of a child over the superior right of the natural parent must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody *and* further must show that it is in the child's best interests that the third party be awarded the care, custody and control of the minor.") (emphasis in original); *Montgomery County Dept. of Social Servs. v. Sanders*, 38 Md.App. 406, 381 A.2d 1154, 1161 (Md.Ct.Spec.App.1977) ("When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child."); *Tubwon v. Weisberg*, 394 N.W.2d 601, 603 (Minn.Ct.App.1986) ("In determining custody of MKT, the court cited *Wallin v. Wallin*, 290 Minn. 261, 187 N.W.2d 627 (1971), which establishes the standard for awarding custody to third parties over the objection of a biological parent."); *In re Guardianship of Lavone M.*, 9 Neb.App. 245, 610 N.W.2d 29, 40 (2000) ("A court may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right; neither can a court deprive a parent of the custody of a child merely because the court reasonably believes that some other person could better provide for the child."); *Bodwell v. Brooks*, 141 N.H. 508, 686 A.2d 1179, 1183 (1996) ("Once the superior court has acquired jurisdiction over a custody proceeding between unwed natural parents, it may use its parens patriae power to decide whether the best interests of the child warrants the intervention of a stepfather as an appropriate party in the custody determination."); *K.B. v. J.R.*, 26 Misc.3d 465, 887 N.Y.S.2d 516, 521 (2009) ("Intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child."); *McDonald v. Wrigley*, 870 P.2d 777, 779 (Okla.1994) ("But courts have long held that statutory language similar to that in § 108 and § 112 is sufficient for a divorce court to award custody of a minor child to a third party when the parents are unfit."); *Jacob v. Shultz–Jacob*, 923 A.2d 473, 477 (Pa.Super.Ct.2007) ("Our courts have long held that '[the] rights and liabilities arising out of that relation [in loco parentis] are, as the words imply, exactly the same as between parent and child.'"); *Middleton v. Johnson*, 369 S.C. 585, 633 S.E.2d 162, 167 (S.C.Ct.App. 2006) ("The notion of a psychological parent or de facto parent was first recognized

by the South Carolina Supreme Court in *Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456 (1989). In *Moore,* the supreme court found that although a psychological parent-child relationship existed between the child and his unrelated custodians, such a bond was inadequate to support awarding permanent custody to the custodians where the biological parent was fit."); and *Randy A.J. v. Norma I.J.,* 2002 WI App 307, ¶ 17, 259 Wis.2d 120, 655 N.W.2d 195 ("Wisconsin has recognized the equitable parent doctrine. *See J.J. v. R.J.,* 162 Wis.2d 420, 426–30, 469 N.W.2d 877 (Ct. App.1991). The equitable parent doctrine extends the rights and responsibilities of a natural parent to a nonbiological parent seeking custody or visitation. *See id.; see also Atkinson v. Atkinson,* 160 Mich.App. 601, 408 N.W.2d 516, 519 (1987). Once a court determines that a party is an equitable parent, there is no distinction between the equitable parent and any other parent; each is endowed with the same rights and responsibilities of parenthood.").

[¶ 33] At least fifteen states and the District of Columbia have statutes regulating third-party custody or visitation issues. *See* Alaska Stat. § 25.24.150 (2004); Ariz. Rev.Stat. Ann. § 25–415 (2009); Cal. Fam. Code § 3041 (2007); Colo.Rev.Stat. § 14–10–123.4 (1999); Del.Code Ann. tit. 13, § 8–201 (2009); Ky.Rev.Stat. Ann. § 403.270 (2004); La. Civ.Code Ann. art. 133 (1994); Me.Rev.Stat. Ann. tit. 19–A, § 1653 (2009); Mass. Gen. Laws Ann. ch. 208, § 28 (1998); Miss.Code Ann. § 93–5–24 (2003); Mo. Ann. Stat. § 452.375 (2005); N.C. Gen.Stat. Ann. § 50–13.2 (2009); Or. Rev.Stat. Ann. § 109.119 (2003); S.D. Codified Laws § 25–5–29 (2002); Va.Code Ann. § 20–124.2 (2009); W. Va.Code Ann. § 48–9–103 (2001); D.C.Code § 16–831.06 (2009). The legislation from these jurisdictions runs the spectrum from single sentence statutes to entire chapters. Colo. Rev.Stat. § 14–10–123.4 (1999); D.C.Code § 16–831.06 (2009).

[¶ 34] Also in contrast to North Dakota's case by case recognition of certain third-party custody and visitation rights, courts in at least five states have refused to recognize these claims, opting instead for legislative guidance. *Nancy S. v. Michele G.,* 228 Cal.App.3d 831, 841, 279 Cal. Rptr. 212 (Cal.Ct.App.1991) (ruling superceded by statute); *O'Dell v. O'Dell,* 629 So.2d 891, 891–92 (Fla.Dist.Ct.App.1993); *Petition of Ash,* 507 N.W.2d 400, 402–03 (Iowa 1993); *In re Hood,* 252 Kan. 689, 847 P.2d 1300, 1304 (1993); *In re J.M.,* 170 Vt. 611, 750 A.2d 442, 444 (2000). The judicial restraint exercised in those jurisdictions was aptly described by one court as follows:

"[E]xpanding the definition of a 'parent' in the manner advocated by appellant could expose other natural parents to litigation brought by child-care providers of long standing, relatives, successive sets of stepparents or other close friends of the family. No matter how narrowly we might attempt to draft the definition, the fact remains that the status of individuals claiming to be parents would have to be litigated and resolution of these claims would turn on elusive factual determinations of the intent of the natural mother, the perceptions of the children, and the course of conduct of the party claiming parental status. By deferring to the Legislature in matters involving complex social and policy ramifications far beyond the facts of the particular case, we are not telling the parties that the issues they raise are unworthy of legal recognition. To the contrary, we intend only to illustrate the limitations of the courts in fashioning a comprehensive solution to such a complex and socially significant issue."

*Nancy S.,* 228 Cal.App.3d at 841, 279 Cal. Rptr. 212 (ruling superceded by statute).

[¶ 35] The legislature is the policy setting branch of government. *See Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118, 124 (N.D.1984) (noting the legislature "can do studies, gather evidence, hold hearings, and come to a decision" and "broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate") (citations and quotations omitted). The legislature and not the court is better equipped to gather broad public input and distill public preferences for handling the hard choices and complex issues involved in determining third-party custody and visitation from the many options available. *See, e.g.,* Gupta–Kagan, *Children, Kin, and Court: Designing Third Party Custody Policy To Protect Children, Third Parties, and Parents,* 12 N.Y.U.J. Legis. & Pub. Pol'y 43; American Law Institute, *Principles of the Law of Family Dissolution* § 2.03 (2002).

[¶ 36] Setting policy through adjudication has an additional limiting factor. A court proceeding without legislative direction is left in the untenable position of building North Dakota's body of law using only the issues raised on appeal in a particular case. *Downtowner, Inc.,* 347 N.W.2d at 124 (stating "Courts are ill-equipped, however, to balance equities among future plaintiffs and defendants. Such forays can result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties.... [S]uch broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate.") (quotation omitted). *See also Cotton v. Wise,* 977 S.W.2d 263, 265 (Mo.1998) ("The problem with a court-fashioned 'equitable parent' doctrine is that the court has to improvise, as it goes along, substantive standards and procedural rules about when legal custody may be modified, what terms and conditions may be set, and other matters that already have well-charted passageways under state statutes and related court decisions.").

[¶ 37] Accepting case-by-case assembly of the law rather than relying on legislation means that parents, children, third parties, lawyers and the district courts will have a delayed or unanswered question about whether a third party can have custody or visitation without first showing the natural or adoptive parents are unfit. *See E.N.O. v. L.M.M.,* 429 Mass. 824, 711 N.E.2d 886, 898 (1999) (Fried, J., dissenting) ("Our imprecise, indirect and piecemeal entry into this field [ (recognizing a 'de facto parent') ] can only cause confusion."). Without legislative action, we must wait for an appeal asking whether the burden of proof should be a preponderance of evidence or clear and convincing evidence. Also delayed or missing is an answer to the question whether third-party custody or visitation should be granted in the child's best interests or whether it should be denied absent harm to the child. Finally for me but not exhaustive of the possible inquiries, present in this case but not appealed and thus left unanswered is the question what courts are supposed to do when two parents with a court ordered custody and visitation schedule are confronted by a subsequent third party request for custodial and visitation rights that will necessarily diminish the parents' time with the child and dilute the parents' rights to supervise and direct the child.

[¶ 38] MARY MUEHLEN MARING, J., concurs.